JOSIE KINSOLVING, Appellant, v. W. D. LASSWELL LUMBER COMPANY and W. D. LASSWELL.—300 S. W. 506.

Division One, December 7, 1927.

*Smith & Zimmerman* for appellant.

*Hal H. McHaney* for respondent.

GRAVES, P. J.—Action to determine title to a small tract of land in Dunklin County. Plaintiff pleads her title, but it is not a record title. Her title is thus outlined in the petition:

"Plaintiff further states that for more than ten years last past prior to the institution of this action, she has been in the open, notorious, exclusive, continuous, adverse and hostile possession under color of title record, claiming to be the owner and is the owner of the following described premises lying and being situated in the County of Dunklin and State of Missouri and described as follows, to-wit:

"The southwest fractional part of the southwest fractional Section 34 in Township 17 north, of Range 9 east of the 5th principal meridian line."

Plaintiff further states that the title of the above described lands emanated from the Government of the United States of America by virtue of the provisions of the Act of Congress of September 28, 1850, and entitled, "an act to enable the state of Arkansas and other states to reclaim swamp lands within their territory limits;" that the title of and to the above described lands was conveyed to the County of Dunklin and became the absolute property of the said

County of Dunklin by an act of the General Assembly, passed and approved March 10, 1869, and other acts.

"Plaintiff further states that for more than thirty-one consecutive years she has paid all taxes, both state and county, levied and assessed upon the above described lands and that neither of the defendants or those under whom the defendants claim have paid any taxes for more than thirty-one consecutive years upon the above described lands."

Such is the basis of her pleaded title. The plaintiff then avers that defendants claimed some title by and through a patent issued by the County of Dunklin, which claim was adverse to plaintiff. Then plaintiff says the county was estopped from claiming any title, because:

"The County of Dunklin by and through its duly elected, qualified and acting officials, with full knowledge of the plaintiff's title in and to the above described lands, has levied, assessed and collected of and from the plaintiff and plaintiff's grantors, taxes upon the above described lands for more than thirty-one consecutive years, thereby and by reason thereof said grantor was estopped from claiming or asserting any title to the above described lands at the time of the execution of the patent therefor to the said defendants as aforesaid.

"Plaintiff further states that with full knowledge of plaintiff's title, the defendants' grantor, the County of Dunklin, has remained quiet, never asserting any title or claim to the said lands or any part thereof, prior to the execution of the patent therefor to defendants, and has permitted plaintiff to make valuable and lasting improvements upon said property and has therefore been guilty of gross laches, whereby said County of Dunklin should be and was estopped from asserting any claim at the time of the execution of said patent to the defendants, as aforesaid, and had no title to convey to any of the said defendants for any of the said lands."

By the answer the defendant, W. D. Lasswell first avers that there was no W. D. Lasswell Lumber Co. This is followed by a denial of "each and every allegation, averment, matter, fact and thing in plaintiff's petition contained." This is followed by express denials and averment of defendant's ownership, in this language:

"And expressly denies that the plaintiff has been in the possession of the land described in plaintiff's petition for more than ten years or for more than thirty-one years, and denies that she has any title or claim of title to the land described in the plaintiff's petition, but it is expressly admitted that the defendant, W. D. Lasswell, does claim some right, title and interest in the land as described in plaintiff's petition, that right being all the fee-simple title to said land.

"Wherefore, defendant having fully answered prays to be discharged with his costs."

This defendant then further answers thus:

"Defendant for another and further answer states that he is the owner in fee simple of the land described in plaintiff's petition, said land being located in Dunklin County, Missouri, to-wit:

"The southwest fractional part of the southwest fractional section of Section 34, Township 17, Range 9 east of the principal meridian line.

"That he and his mesne grantors have been in open, continuous, adverse, notorious and exclusive possession for more than thirty-one years, and that they have paid all the taxes on said land.

"Defendant further states that the plaintiff claims some right, title and interest to the above described real estate, the exact nature of which is unknown to the defendant, except that said claim is prejudicial to the title of this defendant.

"Wherefore, defendant prays the court to ascertain and determine all the right, title and interest of the plaintiff and the defendant in and to the above described land, and if defendant is found to be the fee-simple owner thereof that his title be forever quieted, and for such other and further relief as may be deemed proper in the premises."

The decree entered finds:

"That plaintiff in said cause has not been in the open, notorious, exclusive, continuous, adverse and hostile possession under color of title of record, claiming to be the owner of the property described in plaintiff's petition; that said plaintiff has not for thirty-one consecutive years or more paid taxes, both state and county upon said lands; that the defendant, W. D. Lasswell and those under whom he claims title have paid taxes on the land in controversy for more than ten years prior to the institution of this suit.

"The court doth further find that the county of Dunklin was in no way estopped by reason of its acts and conduct by and through any official of said county to patent the lands in controversy to the defendant and defendant's grantors.

"The court doth further find that the defendant, W. D. Lasswell, is the fee-simple owner in and to the lands in controversy, to-wit:

"The southwest fractional quarter of the southwest fractional quarter of Section Thirty-four (34), lying east of Little River, in Township Seventeen (17) north, Range Nine east of the Fifth principal meridian of Dunklin County, Missouri, containing 27.50 acres more or less.

"The court doth further find that the plaintiff has no right, title or interest in and to said lands."

The judgment followed the findings, supra. Plaintiff asked two declarations of law, which were refused.

The assignments of error are three in number, and read:

"(1) The court erred in refusing appellant's declaration of law number 1.

"(2) The court erred in refusing appellant's declaration of law number 2.

"(3) The court erred in rendering judgment against appellant and in favor of respondents."

The instructions refused, the evidence pertinent to the issues, and other matters are left to the opinion. This outlines the case in a general way.

I. Plaintiff (appellant) has proceeded throughout the trial of this case, as if it were a case at law, and we shall so proceed here. In fact, both parties seem to have so proceeded.

The first contention is that the court erred in refusing plaintiff's first instruction or declaration of law. This instruction covers the doctrine of estoppel, and reads:

"The court declares the law of this case to be: That if the court should believe and find from the evidence that the County of Dunklin levied and assessed the lands described in plaintiff's petition, to the plaintiff and plaintiff's grantors as the owner thereof for the year 1882 and subsequent years, to and including the year of 1902, the time of the executing of the patent to R. H. Jones, and collected state and county taxes for said years from plaintiff and his grantors. then the County of Dunklin was at the time of the executing of said patent estopped from asserting and claiming title to said lands, and the finding, judgment and decree shall be for the plaintiff."

W. D. Lasswell holds the title of Jones under the patent mentioned in the foregoing instruction. There is evidence to the effect that the plaintiff and her predecessors paid taxes (not each year, but at least at intervals for a number of years) which had been assessed by the officials of the county. The fact that the officials wrongfully assessed county property in the name of plaintiff and her predecessors, and collected such taxes from them, does not estop the county from asserting its title. It has been so ruled since the early case of City of St. Louis v. Gorman, 29 Mo. l. c. 599. In the Gorman case, Scott, J., uses this apt illustration of the situation:

"The city being the owner of the land assessed and sold for taxes to the defendant throughout the instrumentality of her officers, it is maintained by him that she is estopped to deny the regularity of the proceedings by which he claims title.

"The city is a body corporate, clothed with extensive powers for the management of her municipal affairs. She can only act through her officers and agents; and if those officers, in violation of her ordinances, do unauthorized acts to her prejudice, it would be hard that she should be bound by them. This, surely, is not the law in

relation to natural persons who act through their agents. If the agent exceeds his authority, his constituent is not bound. Those dealing with agents must look to the extent of their power. Agencies are indispensable in the transaction of the business of men; and, if those who employ them are estopped to deny the validity of the acts performed by them, commerce must be restrained within very inconvenient, if not ruinous, bounds. The State of Missouri owns a tobacco warehouse in St. Louis; if the state officers should assess that property in the name of an individual, and sell it for the taxes, would any one maintain that she was estopped to deny the validity of a title claimed under such a sale? The State has delegated to St. Louis the powers necessary for her municipal government, thus imposing on her an obligation that would otherwise devolve on the State. The city, in the discharge of this duty, is compelled to act by officers. Now, if the State, acting through her officers, is not bound by their unauthorized acts, we can see no reason why the city, in the exercise of functions pertaining to the State and for the performance of which she is substituted in the place of the State, should not stand, in relation to the agents she may employ, on the same ground that the State would to her officers.

"We must all see the numberless frauds the sanctioning of the principle insisted on would produce. The argument confounds the city with her officers and assumes that they are the city. If an officer of the city, in violation of her ordinances, makes a contract with an individual, is the city bound by such a contract? Must not those who contract with the officers employed by the city see that the officers, with whom they are contracting, conduct themselves in pursuance to law? The defendant, claiming that he has obtained the title of the city to a portion of her commons through her officers, is compelled to show that these officers, in assuming to pass a title, acted in pursuance to the ordinances prescribed for the regulation of their conduct on such occasions. This is a well-established rule in regard to all those deriving title to land by means of a sale for the taxes. The bare statement of the law in relation to estoppels *in pais* is sufficient to show that it cannot apply to transactions where there is the interposition of third persons as agents acting in violation of their authority."

See also Hooke v. Chitwood, 127 Mo. l. c. 376; Senter v. Lumber Co., 255 Mo. l. c. 605 et seq.

In this latter case the present writer undertook to and did review the cases in Missouri and elsewhere. The interested are referred to that case for the rule, as well as the reasons for the rule. The Scott opinion (29 Mo. supra) has been cited with approval in several jurisdictions. The appellant's declaration of law covering the question of estoppel *in pais* was properly refused. The things pleaded

as estoppel *in pais,* and covered by said declaration number 1, refused as aforesaid, do not constitute estoppel as a matter of law. Neither facts pleaded nor facts proven measure up to estoppel *in pais* as against a municipality, which can act only through officers. But these matters are fully discussed in the Senter case, supra, and in the cases therein cited. We will not reiterate the reasons there fully given. Read the Senter case for the reasons for the rule as assigned by several courts. The rule is, that the wrongful assessment and collection of taxes by the officers of the municipality, upon property owned by the municipality, does not estop the municipality from asserting its title.

II. The second declaration of law reads:

"The court declares the law of this case to be: That if the court should find from the evidence that plaintiff and her grantors have for more than ten consecutive years, before the institution of this suit, been in the open, notorious, and adverse possession of said lands claiming to own the same, and have exercised such acts of ownership on said lands as said land was susceptible of, then the finding, judgment and decree should be for the plaintiff."

Respondent says that this declaration was properly refused for several reasons. First, they say plaintiff's action is based on Section 1311, Revised Statutes 1919 (31-year statute), and not under Section 1305, Revised Statutes 1919 (10-year statute), and that the instruction or declaration is broader than the pleadings. At the expense of brevity, we set out the vital parts of the petition pretty fully in our statement, supra. This, because of these contentions in respondent's brief. The petition is not especially a model, but we think the petition bases the plaintiff's title upon both of these statutes. They are pleaded in separate paragraphs of the petition. What plaintiff was trying to do was to plead a title by limitations. In separate and distinct paragraphs she alleges facts sufficient to show title by limitations under both of these statutes. This contention will not be allowed.

Next it is said, by respondent, that the declaration of law leaves out an important element, i. e. that it does not require the court to find that plaintiff had the "exclusive" possession of the property. This might have been the reason for the refusal of the instruction, and technically it may have been correct. We rather think there was a more substantial reason, and that we discuss later. But why take time upon this instruction, so far as its technical verbiage is concerned? This particular issue (title by adverse possession for statutory period) was an issue at law, and we are bound by the ruling *nisi* if there was substantial evidence to support the finding of

the court upon such issue. The only purpose that instructions serve in a trial by the court (without a jury) of an issue at law, is to indicate the trend of the court's mind upon the law. In this case the first clause of the findings of fact by the court, in our statement, supra, covers the ten-year Statute of Limitations, as first pleaded by plaintiff in her petition. It will be noted that in this clause the court found: "That plaintiff in said cause has not been in the open, notorious, *exclusive,* continuous, adverse and hostile possession," etc. This shows that the court had in mind this element as to the possession. The court uses the word "exclusive" in his findings of fact upon the issue of possession for ten years. This shows that the court had a correct conception of the law involved, and to be applied to the facts found by the court. What we believe to have been the court's reason we discuss next. Even this reason, if erroneous, would not necessarily call for reversal of the cause.

III. Following up the thought suggested in our paragraph, supra, we think the trial court refused the declaration of law, supra, because it was thought there was no substantial evidence to authorize the giving of the declaration or instruction. This brings us to the vitals of this case, i. e. the facts.

The plaintiff seems to have been married at least three times, and two of the three times she married a doctor. She claims paper title by and through the will of her husband, S. K. Egan, which will was first probated in Wayne County, West Virginia, in March, 1886, having been executed by Egan, in June, 1885. Copy thereof was filed in Dunklin County, in December, 1921, as we gather it from the record. This is only a circumstance tending to show color of title. No claim is made that plaintiff had a good paper, or record, title to the land. Dr. Anderson was the husband after Egan, and his death is stated by plaintiff to have occurred in 1901, fifteen years after the death of Mr. Egan. Plaintiff says she then married Dr. Kinsolving in 1904, and he was living and testified at the trial in 1922. The cause, while tried in 1922 was held under advisement by the court until December, 1923, when judgment was entered.

The plaintiff's own testimony, in chief, is thus given in the record:

"By MR. THOMASSON: My name is Josie Kinsolving and I am the plaintiff in this case. S. K. Egan was my husband, and I am the person named in this will. I have known the lands involved in this suit since the death of S. K. Egan, which occurred in 1886. Since the death of my husband and since I became the owner of these lands we have cut timber off of them at various times, at least Doctor Kinsolving did, and Doctor Anderson built some houses on them for cattle pens and kept cattle over there for a while. All of the land was under fence, and houses were built there, little old shacks for cattle men to stay in and tend to the cattle. There was a fence around

all of it. Walter Ruffin and another young man built the fence for Doctor Anderson, who was my husband at that time. The cattle belonged to me and the fence was placed there as a mark around my land. The fence was built of wire, and it was placed there before Doctor Anderson's death, which occurred in 1901. I know very little about the land, as it was in the woods, but it was reasonably dry. I only rode over it once or twice. I don't know if any of it was ever in cultivation."

The substantial part of her cross-examination is thus recorded in the record before us:

"By Mr. Pankey: I don't know the description of this land, but there were twenty-seven and one-half acres. The land lies across Little River, it was then, across from the sand bar. I knew it was my land because Mr. Brannum and Doctor Anderson were along when I went over it on two occasions. I couldn't identify the land, nor could I tell you where the lines are. The houses were on this land because Doctor Anderson had it run out and the house was put inside of where those trees were marked, inside of that enclosure, and the fence was put up around where the lines were run. Part of the fence was there when I went over the land. It was a wire fence, one strand of woven wire. I don't think the fence is there now, as it has been so long. *I haven't been out there since I married Doctor Kinsolving.* Doctor Kinsolving has never built any houses on the land. The improvements placed on the land consisted of a very common box house for a man to live in, and some sheds built there for cattle and calves, just a very crude little shanty. This house was located back a piece from the river, but I don't remember just how far. I don't know just how far this land was from the river. I don't know what became of the balance of the forty acres, or how there came to be twenty-seven and one-half acres instead of forty. I own some other land over there, but I don't know just where it is located. I have never taken much interest in the land, as it has always been under water and wasn't of much value to us." (The italics are ours in the foregoing.)

Plaintiff married Dr. Kinsolving in 1904, or three years after the death of Dr. Anderson. So the plaintiff had not been on or even seen, the land since 1904, to say the least. At another point in the cross-examination she says: "I didn't cut any timber until I married Doctor Kinsolving in 1904."

This cutting of timber is more fully explained by the Doctor himself, who thus testified at the trial:

"By Mr. Thomasson: My name is F. Kinsolving and I live at Hornersville, Dunklin County, Missouri, and I am acquainted with the lands described as the southwest fractional part and southwest

fractional Section Thirty-four, Township Seventeen north, of Range Nine east. I ran the lines of this land myself in 1907 or 1908, and that was the first time I knew of its location. I have known of this land in a general way since 1888, and there were no improvements on the land at the time I surveyed it, at least I didn't see any. There were no buildings or fences placed on the land after I surveyed it, and I saw no evidence of the land having been fenced. I surveyed the land for my wife. The object of the survey was to locate it for the purpose of cutting timber on it. I had a contract with some parties to cut the timber and I wanted to be sure they didn't cut anybody else's timber, so I ran the lines and marked them. At that time the land was mostly under water; in fact, we had to wade most of the way. I remember we used hip boots, and we wanted to cut the timber while we could float it out during the high water. At that time the land was not susceptible of cultivation. Since the ditches have been cut I haven't been on the land, and I couldn't say just what its character is. We cut several thousand feet of timber from the land, possibly fifteen or twenty thousand feet. My wife does not own the land adjoining this tract. We did not cut any timber off of this land for firewood for our use. The timber was cut off for saw purposes. However, I believe we did cut down some ash to be used at the mill while we were sawing. I don't think there was ever a time when the land could have been put in cultivation, unless just recently, since the ditches were cut. The first ditch was cut past Hornersville in the summer of 1917; the other two ditches, and those above there, were cut later. I have never used the land for grazing purposes.''

For plaintiff tax receipts were offered for the years 1882 to 1920, both inclusive, except for the years 1885, 1888, 1889, 1890, 1891, 1892, 1893, 1895, 1896, 1897, 1898, 1899, 1901, 1909. In other words there are fourteen years out.

Receipts for levee taxes for the years 1904, 1905, 1911, 1917, 1918 and 1919 were shown. So also drainage tax receipts for the years 1910, 1913, 1914, 1916, 1917, 1918, 1919 and 1921, were shown. This substantially is the showing made by appellant as to title by adverse possession for a statutory period of limitations.

The legal effect of such evidence we discuss next.

IV. By a short process of elimination the character of the evidence in behalf of the plaintiff can be determined. The main things shown by her are (1) payment of taxes, at somewhat irregular intervals, and (2) cutting timber from the land. Note here  that there is no claim that this small tract was used in connection with a large tract, and that timber was cut for general use upon the larger tract, of which the posses-

sion was not questioned. On the contrary the evidence of Dr. Kinsolving is that the timber was cut and marketed. Under such circumstances the payment of taxes and the cutting of timber do not constitute or show possession, but merely tend to show claim of ownership.

Thus in the early case of Pharis v. Jones, 122 Mo. l. c. 131, this court said: "The payment of taxes on the land by plaintiff, cutting timber thereon, and keeping off trespassers, did not constitute possession, but were merely acts of ownership, tending to show that he claimed to own it."

In Carter v. Hornback, 139 Mo. l. c. 245, the court said: "The vice of this instruction is in telling the jury that the use of the land in question by cutting and hauling firewood, saw timber, making and hauling fence rails from the land and clearing up same, constituted actual possession. Such acts do not constitute possession, but merely tend to show claim of ownership."

Later in Stone v. Perkins, 217 Mo. l. c. 602, we again said: "And it may also be observed that the defendants' claim of possession by the reason of payment of taxes and cutting the timber on the land did not constitute adverse possession, but were only acts tending to show claim of ownership. [Carter v. Hornback, 139 Mo. l. c. 245.] In our opinion the circuit court properly adjusted the title to this land in the plaintiffs as against the defendants."

It is thus made clear that the payment of taxes, and the cutting of timber (under the circumstances and facts of this case), are not sufficient to show possession, but only tend to show a claim of ownership. We will eliminate this evidence upon the question of possession. With this elimination we must look elsewhere for any proof of continuous possession for ten years. No claim is made of any fencing or other improvements until some time before the death of Dr. Anderson in 1901. Dr. Kinsolving (husband of plaintiff) says he surveyed the land in 1907 or 1908, in order to sell the timber therefrom, and there were no signs of fences or other improvements there then. It was a swamp and he had to use gum boots in making the survey. Even the plaintiff says she had never seen the land since her marriage to Dr. Kinsolving in 1904. If there was a shack of a house, some stock sheds and some wire fencing done shortly before Dr. Anderson's death, as the testimony of the plaintiff tends to show, there is no evidence of any person ever living in that shack of a house. No claim that plaintiff and Dr. Anderson lived there. No name is given of any person that plaintiff ever put in possession of that house, or that fenced land. During all these years the actual title was in Dunklin County. It was there long before Egan's death, and continued there until the patent by Dunklin County to R. H. Jones in 1902. This Jones title passed through mesne conveyances

to W. D. Lasswell, in whom the trial court decreed title. It is apparent to us that the trial court refused plaintiff's declaration of law numbered 2 on the ground that there was no substantial evidence of continuous possession for ten years. Plaintiff's learned counsel do not claim that plaintiff showed a title under the thirty-year statute. There is no substantial evidence that she acquired a title under the ten-year Statute of Limitation.

The trial court found the right solution of this case: Let its judgment be affirmed. All concur.