A. J. SCOTT BRANNER and BARGAIN REALTY COMPANY, Appellants, v. FRED W. KLABER, Public Administrator, and WILLIAM J. CARROLL, Administrator of the Estate of SAMUEL W. SCOTT.—49 S. W. (2d) 169.

Division One, April 12, 1932.*

*NOTE: Opinion filed at October Term, 1931, February 11, 1932; motion for rehearing filed; motion overruled at April Term, April 12, 1932.

*J. M. Johnson, C. W. Prince, James N. Beery* and *Walter A. Raymond* for appellant.

308

*Henry S. Conrad, L. E. Durham* and *Hale Houts* for respondents.

310

HYDE, C.—This is an action to cancel a deed executed January 16, 1909, by the plaintiff Bargain Realty Company, a corporation, to the .original defendant Samuel W. Scott, and to recover the land conveyed. Samuel W. Scott, the defendant, died after the trial in the circuit court and the case has been revived against his administrators. Plaintiff, Annie J. Scott Branner, was a licensed physician. She was married, in 1911, to one Branner, later divorced, but at all times, for professional reasons, was called Dr. Annie Scott, and she will be so referred to herein. She was also engaged in the real estate business, and had organized the Bargain Realty Company for this purpose. She held all of its stock except two shares, which were held by employees, to qualify them as directors. The Bargain Realty Company held title to the land involved herein, which is a tract of about 19 acres. Nine acres were encumbered by a deed of trust securing an

indebtedness of $3,000. The remaining ten acres were encumbered by a deed of trust securing $2,700. This land was in Jackson County near Fairmount Park, between Kansas City and Independence. Dr. Annie Scott platted it as the Kinloch Addition. No lots were sold but the whole tract was conveyed to Samuel W. Scott by the deed sought to be set aside in this action.

Samuel W. Scott appears to have been a man of colorful personality. He went by the title of Dr. Scott, and we will refer to him as Dr. S. W. Scott in order to distinguish him from plaintiff Dr. Annie Scott. He was not a physician and the title of ''Doctor'' was unaccounted for, unless it be, as suggested by the Presiding Judge of this Division at the oral argument, he was a ''doctor of corporations.'' The story of this case goes back to the days of Diaz, the Dictator, who, by an iron-handed rule, kept at peace, for more than 30 years, the turbulent Republic of Mexico. Dr. S. W. Scott, in the early Nineties, was searching the mountains and valleys of that country for gold, silver and oil. During that time he became acquainted with Colonel William Denton, a former English officer, and his wife, of Spanish descent, with high connections in Mexico. One of Mrs. Denton's near relatives was a Justice of the Supreme Court of Mexico and another an Archbishop. Colonel Denton, himself, was said to have been connected in business with President Diaz. Dr. S. W. Scott married the daughter of Colonel Denton and thereafter became acquainted with President Diaz, President Madero and other prominent officials in the Mexican government who, according to his evidence, were friends of the Denton family.

In the course of his travels through Mexico Dr. S. W. Scott discovered a tract of land on the Sota La Marina River in the Mexican state of Tamaulipas, the northernmost of the Mexican Gulf states. Dr. S. W. Scott's first dealing with this land, so far as the record shows, was to obtain the oil rights on it for the first corporation, in which we find him interested, The Mexico-Texas Petroleum and Asphalt Company. Plaintiffs claim that these oil rights were never released and that for this and other reasons Dr. S. W. Scott could not convey a clear title to that part of the land he afterwards attempted to sell, but the evidence leaves all this in doubt. It appears, however, that after litigation in Mexico, in which Dr. S. W. Scott was successful, some kind of a title to 75,000 acres of land, at the confluence of the Sota La Marina and Las Palmas Rivers, was vested in another corporation, organized by Dr. S. W. Scott, called the Sota Marina Land and Development Company. Just what this company attempted to do, with the land, is not clear from the record, but it appears to have been unsuccessful in whatever its object may have been.

In the early part of 1908 Dr. S. W. Scott appeared in Kansas City. He was able to interest some of its real estate dealers in his Mexican tract. In March, 1908, he entered into a contract with six other men, all residents of Missouri, providing for the organization of a corporation to purchase this land from Dr. S. W. Scott. In May, 1908, they, with Dr. S. W. Scott, executed articles of incorporation for a corporation to be known as the Mexican Gulf Land and Development Company, Limited, and to be incorporated in the (then) Territory of Arizona. The Development Company, as we will hereafter refer to it, thereafter received a certificate of incorporation from the Territory of Arizona. Its articles stated that all of the incorporators, including Dr. S. W. Scott, were residents of the State of Missouri. They stated, very broadly, the general nature of the business to be transacted by the corporation, which included, among other things, mining, manufacturing, irrigation, milling, refining, operating power and light plants, operating railways and steamship lines and selling real estate. The reason for incorporating in Arizona was said to be that Dr. S. W. Scott's Sota Marina Company was an Arizona corporation and that he was familiar with the laws and corporate procedure of that territory.

The articles of incorporation provided for a capital stock of $1,000,000, divided into 10,000 shares of the par value of $100 each. It was provided that 2,500 shares should be preferred stock and 7,500 shares should be common stock. None of the incorporators saw fit to risk any of their own money in the capital of this Development Company, but proceeded to obtain its capital by selling preferred stock to the public. With each share of preferred stock sold, a share of common stock was given to the purchaser. This was not so liberal as it first appears, since under the plan of the incorporators, there was little possibility of either being worth anything. It was understood between them, as hereinafter stated, that the capital thus obtained, was to be used in purchasing the Mexican land from Dr. S. W. Scott and paying the Development Company's operating expenses. The first meeting of the stockholders was held May 25, 1908, in Kansas City, and by-laws adopted. The sale of preferred stock was thereafter commenced. This stock selling campaign seems to have been the company's most successful ''development.'' In spite of the fact that Missouri is known as the ''Show Me State,'' citizens of Missouri signed applications that year to purchase more than $100,000 of the preferred stock of this corporation. Dr. Annie Scott was one of these. In July, 1908, she signed applications for 100 shares of preferred stock, which contained the following statements:

"These shares of stock are fully paid and non-assessable and they bear interest from date at the rate of seven per cent (7%) per annum, payable annually.

"This stock is due and payable, principal and interest, five (5) years from its date, but is subject to payment by said corporation at any time.

"It is further understood that I have the option of returning my preferred stock into the treasury of said Company at any time while I am the holder of the same, and to receive in lieu thereof, a deed for land of said company in the Republic of Mexico, at the selling price. Ten dollars ($10) per acre has been fixed for the first 10,000 acres sold.

"The preferred stock purchased by me is a lien on all of the property belonging to said corporation. It is understood and agreed by the holder of this certificate that the corporation reserves the right to sell any part of said land free and clear of this lien by reserving, however, five dollars ($5) per acre for each and every acre sold, as a sinking fund to pay said preferred stock.

"For each share of preferred stock subscribed and paid for by me, I am to have, free of further charge, one (1) share of the common stock of said corporation."

Dr. Annie Scott paid $100 in cash and gave three notes aggregating $9,900, due in one year. She was issued preferred stock certificates, on August 28, 1908, for 100 shares which contained substantially the same agreements as the above application. She also received 100 shares of common stock.

On August 14, 1908, the board of directors of the Mexican Gulf Land and Development Company (which was Dr. S. W. Scott and the other six incorporators) held a meeting at Laredo, Texas, and unanimously accepted the proposition submitted by Dr. S. W. Scott whereby the 75,000 acres of land was conveyed to the company. Dr. S. W. Scott was paid, on the purchase price, $49,830 ($5,170 having been previously paid him) and was also paid $2,000 for expenses of conveyance. It seemed that such a conveyance required almost the ceremonies of treaties between nations. Mrs. S. W. Scott, who spoke Spanish, was present as an interpreter. To take care of the formalities, the parties had present Judge Mullally, a Texas lawyer, and General Garza Ayala, a Mexican lawyer. [See Booth v. Scott, 276 Mo. l. c. 20, 39.]

The proposition, which the board accepted, provided that Dr. S. W. Scott should cause to be conveyed, to the Development Company, the 75.000-acre tract for $150,000 and 1,000 shares of common stock of the company, but that the company should issue to Dr. S. W. Scott certificates for all of the preferred and common stock

of the company, which he should hold to secure the payment of the purchase price, except five shares of common stock to be issued to each of the other directors in part payment of their services to the company. When 1,000 shares of preferred stock had been sold Dr. S. W. Scott was to transfer back this number of shares of both preferred and common stock to be issued to the purchaser and was to receive the first payment of $55,000. (This apparently was immediately done.) The remainder of proceeds received for the sale of the first 1,000 shares should be used by the company for promotion expenses and developing the land. The company further agreed to sell as soon as possible as much of the remainder of the preferred stock as would be necessary to pay Dr. S. W. Scott the balance of the purchase price of $95,000 with six per cent interest. It was further provided that, if land could be sold fast enough to pay him, the sale of the preferred stock could be suspended. Dr. S. W. Scott was to receive two-thirds of the proceeds of all sales. Provisions also were made for surveying the land and laying out a townsite and providing for water supply for irrigation. Dispelling all remaining doubt, of those for whose benefit the corporation was organized, it was agreed that the other six directors, upon final payment of the $95,000 to Dr. S. W. Scott, should have the remaining 3,970 shares of common stock divided among them for their services; and also that, in case it was not necessary to sell all of the preferred stock, the remaining common stock, which was to be given with each share of preferred stock, should be divided equally among the directors, including Dr. S. W. Scott. It was further provided that Dr. S. W. Scott, at the expiration of five years, could sell at public or private sale, the stock remaining in his hands, to pay any balance remaining due him at that time.

A good many of the stockholders had executed notes in payment for their preferred stock, with the understanding that they should see the "Promised Land," before their notes matured. Accordingly, an excursion was organized by the directors for them and other prospects. In December, 1908, they went by steamer from Galveston to Tampico, and from there in small boats up the Soto La Marina River. The party went over some of the land on horses and mules and were taken across the mountains to Victoria, the capital city of Tamaulipas, a distance of about 100 miles, from which place they returned to Kansas City by rail. It appears that the directors of the Development Company had visions of a railroad from Brownsville, Texas, to Tampico, which would traverse the land purchased by the company from Dr. S. W. Scott. This proposed railway was shown on a map of the National Railways of Mexico, introduced in evidence, by a dotted line, which indicated its proposed route. They also

heard of a great harbor at the mouth of the Soto La Marina to be constructed by the Mexican government. They believed President Diaz to be interested in these developments, although what assurances they had or from what source they came does not appear. It does not seem improbable that the excursionists heard of these prospects. At any rate, when Dr. Annie Scott returned to Kansas City, after this trip, she wrote the following enthusiastic letter:

"Kansas City, Missouri.
"January 22, 1909.

"Mexican Gulf & Development Co., Ltd.,
"Kansas City, Mo.
"Gentlemen:

"Having had time to get myself settled and think over my trip to Mexico, beg to say that this is the best tract of land I ever looked at. I also wish to thank you for affording me so much pleasure and beg to say I wish to proceed at once to close up my contract for the 1,000 acres.

"The Soto La Marina river which is the northern boundary of your land is as clear as it can be and must average about one mile wide and probably thirty feet deep. The Las Palmas river which is the eastern boundary of this property is about one-fourth the width of the larger river.

"I would think the healthful climate which exists in this valley would be the very place for any one suffering with lung trouble, catarrh or any of the many effections which this northern climate is subject to.

"With this large tract of land, its climate, soil and water I see no reason why this should not be a good investment and I further believe the location which you have selected for your townsite at the confluence of those two rivers will make a very attractive city and prove to be in my judgment one of the most beautiful places to live in the Republic of Mexico or elsewhere.

"To me the idea of raising onions, sugar cane and the many tropical fruits were the main things.

"Yours very truly,
"(Signed) Dr. Annie J. Scott."

On January 16, 1909, the Bargain Realty Company executed a deed to the Kinloch Addition to Dr. S. W. Scott. This deed was recorded on January 26, 1909. The deed recited a consideration of $10,000 and conveyed the property subject to two deeds of trust aggregating $5,700. The deed given pursuant to an arrangement whereby Dr. S. W. Scott accepted it in lieu of $10,000 of the purchase price, due from the Development Company to him for the Mexican land, and he executed a receipt for this amount to the Development Company.

This transaction paid off in full the notes aggregating $9,900 which Dr. Annie Scott had given the Development Company for her preferred stock. She said, however, the canceled notes were never returned to her and it is not shown what became of them. The secretary of the Development Company said that this arrangement, for the payment of her notes and the credit therefor from Dr. S. W. Scott to the Development Company, was made by himself and the president of the company.

The Mexican land was described in detail by Dr. S. W. Scott and several of the original directors of the Development Company. Some of it, at least, seems to have been very fertile, valley land, although there were some rocky ridges through parts of it. The confluence of the two rivers was about eighteen miles from the Gulf of Mexico and the tides came up beyond this point. The climate was very dry and it was necessary to irrigate the land in order to farm it to its full capacity. They said, the lowland would raise corn, cotton and frijoles without rain. Tomatoes, lemons and oranges grew wild. A plant, known as henequin, from which fibre for rope, imitation silk and other materials is produced, grew anywhere on the land without irrigation. It was said to be a plant of the cactus variety and a valuable crop. One of the engineers who surveyed the land said that about one-fourth of it, or 18,500 acres, could be irrigated at a cost of $25 per acre by pumping water from the the river. That as much as 50,000 acres of land could be irrigated by building a dam, up the river above the land, and constructing ditches to it. The cost of such a project was not shown, except that it would cost more than to merely pump water to one-fourth of the land. The land was mostly in a wild, undeveloped state. The lowlands were covered with mesquite and cactus and the uplands with a good deal of timber. There were some ebony trees, but they were small and their value seems to be doubtful. The land was populated chiefly with wild game. There were deer, turkey and wild pigs. One of the original directors who made a trip to the land said that he went down to take a swim in the cool, clear waters of the river, but changed his mind when he saw that an allegator was there first.

The Development Company secured a concession from the Mexican government for irrigation rights in 1910. It required the works to be completed within seven years and to pay the department of the State of Tamalipas, in which the land was located, $400 per month until the completion of the work. This, however, was after Dr. S. W. Scott had sold out his interest in the company.

The company appears to have met more sales resistance from the public during the year 1909, and by December found it necessary to give a chattel mortgage on its office furniture. During that year

some engineers were surveying the land and laying out the townsite and one man had actually moved onto the land, although it is not very clearly shown whether he was an employee or a colonist. The directors began to pay themselves for their services by conveyance of the company's land. It was later claimed in a suit for receivership brought against the Development Company that there had been conveyed to the directors and members of their families, including Dr. S. W. Scott's wife, something like 42,000 acres of the company's land. It is hardly probable that all of this was the poorest land in the tract.

In the early part of 1910 Dr. S. W. Scott succeeded in making himself troublesome enough to the other directors (some of the original directors had by this time resigned and been replaced by others who had purchased stock) that they settled with him, by paying him the balance due on the purchase price of the land, amounting to about $85,000, and conveying to his wife 12,000 acres of the land for the surrender of his 1,000 shares of common stock. This money was partly raised by the sale of some 14,000 acres of land at $5 per acre to some people in New Mexico who became directors. Dr. S. W. Scott, thereafter, washed his hands of the Development Company and all its affairs and went to Oklahoma, where he became engaged in the oil business. His business there was operated through successive corporations, some of these he completely controlled and in some he associated himself with others. His oil operations eventually took him also to California, where he seems to have operated through still other corporations.

The Development Company was forced to suspend operations in Mexico and withdrew its engineers in 1910 because of the disturbance which culminated in the overthrow of the Diaz government by Madero. In fact, when the Revolutionists began shooting, they did not even wait instructions to leave. One of the new directors of the company, who was there at the time on business concerning the irrigation concession, after hearing bullets whistle through his hotel, and his pullman car on the way out, said he had no desire, after that, to go back. The company's offices in Kansas City were soon closed, leaving unpaid judgments for rent and telephone bills, and the company's books taken to Raton, New Mexico, where it was claimed they were at the time of the trial. The company does not seem to have been formally dissolved, neither had it made corporation reports nor paid corporation fees due in Arizona for several years preceding the trial. The history of this corporation and litigation growing out of it has been reviewed in four appellate courts, to which we refer those interested, namely: Booth v. Scott, 276 Mo. 1, 205 S. W. 633, 240 S. W. 217; Roseberry v. Scott, 120 Kan. 576, 244 Pac. 1063;

Montgomery v. Schwald. 177 Mo. App. 75, 166 S. W. 831; Scott v. Booth, 253 U. S. 475; 40 Sup. Ct. 484; 64 L. Ed. 1020.

Dr. Annie Scott testified that she first met Dr. S. W. Scott in June, 1908, at the Densmore Hotel, where she lived at that time. She said that Mrs. S. W. Scott first talked to her there and introduced her to Dr. S. W. Scott. Her testimony was to the effect that Dr. and Mrs. S. W. Scott entertained her frequently, at the Densmore Hotel and at a house they later rented; had her stay with their daughter while they were away; even tried to trace a relationship to her grandfather; and thus gained her confidence. She said that Dr. S. W. Scott told her that he was a friend of Diaz; that the Development Company had paid up stock of one million dollars; advised her to buy the stock and take land in Mexico for it; that the land would be worth $500 an acre as soon as irrigated; that they raised four crops of onions a year there; that they would all go to Mexico to live; that she could have her ground next to the land of Mrs. S. W. Scott and her daughter; and that he would look after it for her. She said that she bought the stock from him because of her reliance on these representations; that she delivered the notes she gave for the stock to him; and that, as soon as she came back from Mexico, she asked for a deed to 1,000 acres of the land for her preferred stock, but was told no deeds could be made until the engineers had finished surveying.

Dr. Annie Scott testified to conversations with Dr. S. W. Scott after the time he went out of the Development Company and also concerning her efforts to get a deed to the Mexican land, in part, as follows:

"Q. Did you ever offer this stock to Dr. Scott at the time you made your election to take the land? A. Yes, sir.

"Q. Tell the court what was said and done? A. I offered it to him—the last time I offered it to Dr. Scott, was in the early part of 1910 and he was going into the Commerce Building then. He had been drawn out of the company. And I said, 'I need money so bad; I wish you would take my stock and give me back my land.' And I said, 'I owe Mr. Ridge $150 and I will sell it and get it.' He said, 'I am out of the company and I can't do anything with it now. They mismanaged the company and it has no merchantable value,' but he said to go and get the land and the land would be worth $50 as soon as water was put on it. He said it would make me rich and said he didn't want the stock back. He said, 'Don't bother about the stock—get your land.' I asked him about the ditches and he said, 'I am out of the company now and I am going after those fellows and see that they put the water on there.'

"Mr. Dean: When was that? A. I think it was the middle of February probably, 1910.

"Q. Did you talk with Dr. Scott any more about it? A: Yes, I talked with him every time I met him.

"THE COURT: Did you meet him often? A. I did the first few years up to 1913. Then my note was going to be due. I thought I ought to get my land before that fell due; so then I called Dr. Scott up, and they told me he was in Oklahoma and I asked when he would be back and they said he would't be back, that he was down there in the oil business. Then I went to call McGeehan, who had surveyed the ground in 1913 and he had him pick out what he said would be good ground for me. I wanted a deed for it and went to the president of the company and went to all of them and said, 'I want my deed,' and they said, 'We are going to have a meeting of the board of directors and we will see about making you a deed' and I waited about a year and didn't get my deed. In the meantime I called Dr. Scott's house again and somebody said he was in Oklahoma but finally I met him one day and he said he had some good oil stock to sell. He said, 'The war isn't over yet and when the war is over you are going to get rich; we are going to bore for oil on it.' And he said he was making good money in Oklahoma on oil; and I kept waiting, and finally when the war broke out here and there wasn't much business here I went down to Miami, Oklahoma, to build some houses. I started to buy some little lots that had a corporation title to them. I went down to Oklahoma City to look up the titles and looked up the Scott Oil Company and found out it was a good company. The people spoke about Dr. Scott so finally Dr. Scott came up to Miami and came out and I asked him about the Kinloch Addition and he said he couldn't make me any deed then until they got the Booth case out of the way; that then they would make me the deed.

"THE COURT: Who would make the deed? A. Whoever was to make them.

"Q. Deed to what? A. Deed either to the Kinloch property—then I said, 'I need money so bad; I wish I had my Kinloch back.' And he said, 'As soon as we begin to bore for oil down there, you will be the richest woman in the world.' I came back to Kansas City in 1918 and Dr. Scott wasn't here and I went up to see Mr. McLin. Somebody told me he was the attorney for the Mexican Gulf Land & Development Co., and he said, 'I wouldn't advise any client of mine to make a deed in the Mexico stuff until after the Booth case is settled.'

"Anyway I couldn't get my deed until after the Booth case was settled. Then in 1920 a man up here from Texas and I tried to make a deal with him and tried to get my deed. A man by the name of Holton—he said he would see if he couldn't do something, so I went up to Mr. Schwald and he told me they were going to have a

meeting of the directors the first day of May. Then I went to hunt up some stockholders to see if they were going to attend the meeting and went up and saw Mrs. Booth and she said, 'You won't get a deed. You had better go up and see Mr. Prince.' . . .

"In 1915 I met him (Dr. S. W. Scott) here. In 1917 I met him in Oklahoma. In 1916, in front of the Commerce Building in Kansas City, Dr. Scott said he was in the oil business and was living in Oklahoma.

"Q. Now what was said—was anything said about the Booth case at that time in front of the Commerce Building?

"I told him I heard that Mrs. Booth had sued them and he said, 'We beat her but she appealed to the Supreme Court.' And he said, 'We will beat her there because we do interstate commerce.' That the Booth case wouldn't have anything to do with them because they did interstate business.

"That was in 1916. I asked him about my Kinloch property and he said that after the war was over they were going to make the ditches and I would have plenty of money.

"THE COURT: When did he tell you he was out of the company?

"That was in 1910—the latter part of February or the 1st of March.

"I told him I wanted my land or my property back. I told him in Miami in 1917 and in front of the Commerce Building in 1916, and in 1910 in February or March, that I wanted my property back because I could handle that and I couldn't wait on the other.

"Q. That was an expression of yours. What did he say to you? A. He told me then that he was out of the company and he was going after them and make them put the water on and then I would be a rich woman because that ground would be worth a lot of money.

"Q. What did he say the next time? A. He said that the war was so bad that they couldn't put men down there to work when everybody was getting killed by everybody else.

"Q. Was anything said about the outcome of the Booth case?

"In Miami I asked him about that and he said if anything happened, or 'if you don't get your Mexico land, I will get your land back, I am not going to take anything from you,' and I didn't think he would.

"MR. DEAN: That is what he said to you and you didn't think he would take anything? A. No, I didn't think he would. He was a nice man.

"Q. He had your deed to the Kinloch property, didn't he? A. I know, but he kept telling me he was going to give me what I wanted, and he was right, because the war was going on.

"Q. Did you rely upon these statements that Dr. Scott made to you? A. Why, of course. He had always been good to me."

Dr. Annie Scott testified that she first knew that Mrs. Booth had sued Dr. S. W. Scott and the other directors of the Development Company in 1914. The opinion of this court in the Booth case was handed down June 4, 1918, and transfer to the Court en Banc was denied on September 16, 1918. Dr. S. W. Scott denied that any of the conversations testified to by Dr. Annie Scott ever took place. He denied that he had anything to do with selling her the stock or that he made any representations to her whatever, but claimed that she asked his advice and he told her to go to Mexico and see the land for herself before she bought. Dr. and Mrs. S. W. Scott and their daughter all denied that they entertained Dr. Annie Scott at the Densmore Hotel or in their home and testified that Mrs. S. W. Scott and her daughter were not even in Kansas City during these times. It was, however, shown by former servants and other guests that Dr. Annie Scott did come to talk to Dr. S. W. Scott at his house about Mexican affairs and that she had, on some of these occasions, been at meals there.

After this suit and a *lis pendens* were filed in May, 1920, a deed, dated June 17, 1919, to the Kinloch property, from Dr. S. W. Scott to his wife and daughter was recorded in August, 1920. We will, therefore, consider this case as though the title remained in Dr. S. W. Scott. Prior to the time of this conveyance Dr. S. W. Scott had paid the mortgages aggregating $5,700, which were liens against the land when Dr. Annie Scott conveyed it to him. He also paid all taxes and claimed to have spent considerable amounts to improve it but whether or not this increased the value of the land was not shown.

The stock, which Dr. Annie Scott received from the Development Company, was at the time of the trial in the possession of Mr. Guthrie, who had been her attorney. She testified that he got possession of it on March 7, 1910. This was soon after the time she said Dr. S. W. Scott refused to take it back and reconvey her property. Some time before that, she had delivered the certificates to another man as security for a loan of $150. Mr. Guthrie advanced her $35 more and got possession of this stock, promising to take up the $150. The stock was transferred to the Spaulding Realty and Investment Company, a corporation, which was one of the plaintiffs in a suit brought in 1911, on behalf of the preferred stockholders against Dr. S. W. Scott, the other incorporators and original and subsequent directors, in which it was sought to recover $150,000 from them and to have a receiver appointed for the Development Company. It was alleged in the petition in that case that the Spauling Company was the owner of the stock issued to Dr. Annie Scott. Mr. Guthrie's firm were the attorneys for the plaintiffs. Dr. Annie Scott testified as a witness at the trial of that case. She was unable to get possession of the stock certificates from Mr. Guthrie and

tender them when this suit was tried. She, however, stated in her petition that she "is willing to do such equity as the court may decree." Two years after the trial, but prior to the overruling of her motion for new trial, she filed an offer of restitution of the stock in which she stated she now had possession of it and tendered it. Other facts, shown by the eight-hundred page record in this case, which are deemed material, will be hereinafter noted in the opinion.

No question is raised as to the pleadings so we will not refer to them except to note that defendant's answer set up, among other defenses, that plaintiffs' action was barred by the Statute of Limitations, Section 1305, Revised Statutes 1919, now Section 850, Revised Statutes 1929, and that plaintiffs failed to, and were unable to, restore to Dr. S. W. Scott the amount he credited the Development Company in cancellation of plaintiffs' indebtedness; and that plaintiffs' reply set up estoppel to invoke the Statute of Limitations and denied that the defendant had been in adverse possession for ten years. The judgment entered was that plaintiffs had no rights in the land and that their bill be dismissed, but in a memorandum opinion filed the Chancellor's findings upon controverted issues of fact and his conclusions of law were set out. From this judgment plaintiffs have appealed.

The Chancellor's views are shown by the following portions of his memorandum opinion:

"I do not say that S. W. Scott was free from fraud in procuring said deed. In the view I take of this case it is not necessary for me to find whether or not S. W. Scott procured plaintiff's subscription to the stock of the company, or practiced fraud upon her either in procuring said subscription or the execution of said deed. But for the purposes of this decision I shall assume that S. W. Scott procured plaintiff's subscription to the stock of the company, and that he practiced fraud upon her in so doing; and also that he practiced fraud upon her in procuring the execution of the deed. I also assume that plaintiff could have rescinded the deed to S. W. Scott had she moved promptly and in proper manner. But the deed was not void, it was merely voidable, to be set aside by plaintiff in a timely and proper action for that purpose.

"The indebtedness from the company to S. W. Scott was valid, incurred by virtue of a contract made between S. W. Scott and the company in Texas, and therefore not covered by the Booth case. Plaintiff could not have rescinded the deed except in some manner affording S. W. Scott an opportunity to have restored to him the amount credited by him upon said indebtedness.

"But however this may be, a fatal objection to plaintiff's attempt to set aside said deed and to quiet her title to the land conveyed therein, is that the attempt came too late. Plaintiff's suit for that purpose was instituted more than eleven years after the execution

of the deed; it should have been brought within ten years after the execution of the deed. . . .

"The overwhelming evidence in this case is to the effect that defendant always maintained his residence or usual place of abode in Kansas City; that he maintained his family therein during all the time after plaintiff's cause of action accrued—assuming for the purposes of this case that plaintiff had a cause of action—that defendant kept said residence open all such time, kept thereat someone over the age of fifteen years upon whom service of process could have been had as provided by law. Under these circumstances the Statute of Limitations never ceased to run, and plaintiff's right to complain herein was barred when the plaintiff herein filed her petition, except for some other reason urged in behalf of plaintiff.

"Plaintiff testified that defendant lulled her into quiescence by assuring her that if the Booth case was decided in favor of Mrs. Booth, he would return plaintiff's land to her, and prayed to plaintiff to wait until the decision of the Booth case. This testimony was contradicted by defendant, and his denial is supported by all the history of the litigation of which this case is a part. Outside of the bare statement of plaintiff, there is no circumstance in evidence indicating that defendant ever offered to return the land to plaintiff, or asked her for indulgence. It is true that plaintiff did wait for the decision of the Booth case before bringing this suit, but there is no evidence—even plaintiff does not testify—that after such decision she asked defendant to convey back the land to her. The fair inference is that plaintiff waited until the decision of the Booth case to bring a suit of her own for the reason, and because that without the Booth decision she did not care to venture a suit of her own."

It will be seen that the trial court's decision was based solely upon the ground that plaintiffs' action was barred by the Statute of Limitations. This court held in the Booth case (276 Mo. 1, 205 S. W. 633) that the acts of the Development Company were absolutely void and that parties, who dealt with it, were entitled to relief, against its incorporators as partners, as though no corporation had been formed. Our law does not permit a fraud feasor to hide behind a corporate form. [Meir v. Crossley, 305 Mo. 206, l. c. 233, 264 S. W. 882.] Appellants say that there are facts in this record which did not appear in the Booth case which show the validity of the corporation and the honest purpose of its incorporators. We, however, find nothing in this record which leads us to doubt the correctness of the Booth case. The purpose for which the stock was sold, so far as Dr. S. W. Scott was concerned, at least, was to get $150,000 for himself from the public. All the money received by the Development Company was either paid to Dr. Scott or was used to inveigle money, for him, from the public. The corporation was void. It

was a mere smoke screen to hide the manipulations by which Dr. S. W. Scott obtained good money for land apparently without market value. Whether the other incorporators were intentionally aiding and abetting Dr. S. W. Scott in obtaining this money from the public or were merely duped by him is immaterial here. When the purported corporation commenced business, and contracted with Dr. Scott for the purchase of the land, its assets consisted of nothing more than a visionary scheme and rarefied atmosphere. When it ceased operations it had exactly what it started with—nothing.

The evidence is indeed convincing that the venture could not have succeeded if there had been no Revolution in Mexico. A business corporation can no more operate without capital and without income than a man can defy the laws of gravitation and pull himself up by his own boot straps. Before there was any Revolution, Dr. S. W. Scott had his money and a substantial slice of the land and had gone to seek other fields in which to display his talents. Much of the rest of the land had been parceled out to directors for their services. No reserve had ever been established to pay back the people, whose money, paid for preferred stock, had filled the pockets of Dr. S. W. Scott. There is no reason to believe that Dr. S. W. Scott was selling the land to the Development Company for less than it was worth, and, certainly, there was no possible way shown for the company to have ever had sufficient funds for irrigation.

Plaintiffs therefore got nothing for the Kinloch property except a piece of paper, a void and worthless preferred stock certificate. The notes which Dr. Annie Scott gave the Development Company, for it, were wholly without consideration. The credit which Dr. S. W. Scott purported to give the Development Company for canceling these notes was, therefore, so far as he was concerned, merely a useless gesture. Since the sole purpose of this void corporation, while Dr. S. W. Scott was connected with it, was to get $150,000 from the public for Dr. S. W. Scott, it made no difference whether the money or property, received for preferred stock, went first to the company and then to Dr. Scott; or whether it went direct to him, in the first place, as did plaintiffs' land. The equities of this situation are not difficult to determine. The only conclusion we can reach is that the result, of the transaction between Dr. S. W. Scott and plaintiffs, was that Dr. S. W. Scott obtained plaintiffs' Kinloch property by fraud and without consideration.

This being true, plaintiffs' right of action to cancel the conveyance and recover the land, accrued when plaintiffs' deed was delivered to Dr. S. W. Scott in January, 1909. [Kober v. Kober, 23 S. W. (2d) 149.] It was shown that he took possession of the property and rented it for the year 1909 to a neighboring dairyman. From that time until this suit was commenced plaintiffs were never in possession. Plaintiffs contend that the possession of Dr. S. W. Scott was

not continuous, but the evidence shows that he at all times kept it fenced and either had it rented or had his own employees there making improvements. Plaintiffs' action was, therefore, barred under Section 850, Revised Statutes 1929, which provides: "No action for the recovery of any lands, tenements or hereditaments, or for the recovery of the possession thereof, shall be commenced, had or maintained by any person, . . . unless it appears that the plaintiff, his ancestor, predecessor, grantor or other person under whom he claims was seized or possessed of the premises in question, within ten years before the commencement of such action." This statute provides the limitations for real action. Failure to discover fraud, by which a defendant obtained the land, or acts of a defendant in concealing fraud does not toll the running of this statute. [Kober v. Kober, 23 S. W. (2d) 149, l. c. 152; Parish v. Casner, 282 S. W. 392, l. c. 409; Turnmire v. Claybrook, 204 S. W. 178, l. c. 179.] This statute applies alike to all actions, whether they were, before the enactment of the Code, called legal or equitable. [Kober v. Kober, 23 S. W. (2d) 149, and cases cited.] These rules concerning actions to recover real estate have been settled ever since Rogers v. Brown, 61 Mo. 187.

In discussing such actions, this court said, in the Rogers case, 61 Mo. l. c. 192: .

"But the statute does not say that if any person entitled to commence an action for the recovery of real property on account of any fraud, shall for any time be ignorant of the facts constituting such fraud, that the time of such ignorance shall not be deemed to be a portion of the time limited for the commencement of such action, and that such action may be commenced within ten years after the discovery of the fraud."

The court points out that the only exception applicable to real actions, other than where a party is under a disability, is the following:

" 'If any person, by absconding or concealing himself, *or by any other improper act, prevent the commencement* of an action, such action may be commenced within the time herein limited, after the commencement of such action shall have ceased to be so prevented." [Now Sec. 879, R. S. 1929.]

This section and several other sections, commencing with Section 875, which specifically provide that they relate to both real and personal actions, are included under Article IX of the "General Code" in the revision of 1929, entitled "Personal Actions and General Provisions." Originally, in the revision of 1855, there were three articles relating to limitations: Article I, Real Actions; Article II, Personal Actions and Article III, General Provisions. The two latter have since been consolidated. The court in Rogers v. Brown, supra, after discussing former cases, such as Hunter v. Hunter, 50 Mo. 445, and English cases, in which it was held that, in equity cases based on

fraud, the Statute of Limitations did not commence to run until the discovery of the fraud, said, l. c. 194:

"Prior to the adoption of the code and the present Statute of Limitations, the equity doctrine, as stated in the case of Hunter v. Hunter, undoubtedly obtained; but we do not conceive it to be the rule now, farther than it may be found to have been incorporated in the provisions of the 24th section above quoted." [Sec. 879, R. S. 1929.]

This court held, in the case of Reisse v. Clarenbach, 61 Mo. 310, indicating what would be an "improper act" provided for in Section 879, Revised Statutes 1929, that, while the concealment of a deed to defraud creditors might be such an "improper act" which would postpone the running of the Statute of Limitations, that as soon as it was put on record, the creditors and all the world had notice of it and were required to act within ten years, from that time, to set it aside. It has been, consistently, held that the Statute of Limitations, as to real actions, applies alike to actions at law and suits in equity, the purpose of which is to recover possession of land. [Dunn v. Miller, 96 Mo. 324, 9 S. W. 640; Hoester v. Sammelman, 101 Mo. 619, 14 S. W. 728; Potter v. Adams, 125 Mo. 118, 28 S. W. 490; Summers v. Abernathy, 234 Mo. 156, 136 S. W. 289; Marshall v. Hill, 246 Mo. 1, 151 S. W. 131; Zeitinger v. Annuity Realty Co., 28 S. W. (2d) 1030, l. c. 1035; Young v. Southwestern Bell Tel. Co., 318 Mo. 1214, 3 S. W. (2d) 381.] And that the Statute of Limitations begins to run from the time there is actual notice of the conveyance or from the time the deed is recorded. [Hughes v. Littrell, 75 Mo. 573; Whitaker v. Whitaker, 157 Mo. 342, 58 S. W. 5; Hudson v. Cahoon, 193 Mo. 547, 91 S. W. 72; Faris v. Moore, 256 Mo. 123, 165 S. W. 311; Turnmire v. Claybrook, 204 S. W. 178; Parish v. Casner, 282 S. W. 292.]

In this case Dr. Annie Scott, of course, knew that Dr. S. W. Scott went into possession of her land under the deed she made him in January, 1909. We might well construe his conduct during his connection with the Development Company as "improper acts" which "prevented" the commencement of this suit, but she knew that he sold out and left the Development Company in February, 1910. Her own testimony is that at that time she had a conversation with him, in which he told her that the stock had no merchantable value, and refused to take back her stock or give her back her land. She, however, failed to commence suit within ten years after that time. Even if we held that, under Section 879, plaintiffs' action was not barred until ten years, after this demand of plaintiffs and refusal of Dr. S. W. Scott to return the land, still this suit was not brought in time.

It is true that Dr. S. W. Scott, then and afterwards, made indefinite, evasive and unreasonable statements about the value of the land *if* the wars ceased in Mexico, *if* it was irrigated, and *if* oil was found

on it, but it is clear that plaintiffs were not *prevented* by such statements from bringing suit. [See Burrus v. Cook, 215 Mo. 496, 114 S. W. 1065.] A suit was brought on behalf of all stockholders of the Development Company in 1911, in which Dr. Annie Scott testified. In this case her stock, transferred to one of the plaintiffs, was used, in connection with that of other stockholders, as the basis for an action to put the Development Company into receivership and recover $150,000 for the benefit of the preferred stockholders from Dr. S. W. Scott and his associates. The successive petitions in that case alleged most of the fraudulent acts of Dr. S. W. Scott and the other incorporators of the Development Company referred to herein and in the Booth case, including doing business in this State without legal authority. Mr. Guthrie, who was acting as her attorney at that time and had possession of her stock, brought that suit. The fact that that suit was pending may be the explanation of her subsequent inaction. That litigation was not terminated until after the Booth case was decided in this court. It was dismissed in 1919 for want of prosecution. She knew, by 1914, that Mrs. Booth had brought suit to recover what she had given for her stock in the Development Company. The Booth case was commenced in 1912. She even had more than seven months, after the Booth case was decided, against Dr. S. W. Scott and the other incorporators, in this court, to bring this suit, within ten years from the time she conveyed her land, and she had a year, more than that, to bring it, within ten years from the time Dr. S. W. Scott refused to return her land in February, 1910. This case does not come within any exception to the running of the Statute of Limitations of Real Actions. Her action was, therefore, barred by the statute, enacted by our Legislature, prescribing limitations for actions to recover real estate and we are not at liberty to insert exceptions in it. [Kober v. Kober, 23 S. W. (2d) 149; Parish v. Casner, 282 S. W. 392; Turnmire v. Claybrook, 204 S. W. 178.] the maxim ''Equity aids the vigilant, not those who slumber on their rights'' is the principle which underlies Statutes of Limitations. [21 C. J. 193, sec. 180.] It is also a matter of public policy that land titles be settled.

Plaintiffs seek to avoid the bar of the statute, by pleading that defendant was estopped to assert it as a defense. They claim that Dr. S. W. Scott, by fraudulent representations and fraudulent promises, lulled Dr. Annie Scott into quiescence and obtained her forbearance from commencing suit against him. In considering this feature of the case we are confronted with the finding of the Chancellor, adverse to plaintiffs, on the facts. Although this court hears an equity case *de novo* on the merits, it is the·rule to defer to the findings of the Chancellor, where they are not against the weight.of the evidence, especially where the witnesses personally appeared before him and their credibility is involved. [Blackiston v. Russell, 44 S. W. (2d)

22; Friedel v. Bailey, 44 S. W. (2d) 9; Norton v. Norton, 43 S. W. (2d) 1024; Kent v. Crockett, 274 S. W. 460.]

If a defendant makes an agreement, even though verbal, not to plead the Statute of Limitations, in consideration of the other party forbearing to sue, he is estopped, after obtaining forbearance until the limitation period has run, from afterwards pleading the statute. [Bridges v. Stephens, 132 Mo. 524, 34 S. W. 555; Munroe v. Herrington, 110 Mo. App. 509, 85 S. W. 1002; St. Joseph & Grand Island Ry. Co. v. Elwood Grain Co., 199 Mo. App. 432, 203 S. W. 680; 37 C. J. 726, sec. 44; 17 R. C. L. 884, sec. 243; 9 Ann. Cas. 756, note; 63 L. R. A. 201, note.] Likewise, where a party gives another assurance that a certain claim in controversy will be accepted and credit given therefor, on settlement of mutual accounts, the party, giving such assurance, cannot thereafter, when the Statute of Limitations has run against the disputed item, invoke the Statute of Limitations as a defense. [Swofford Dry Goods Co. v. Goss, 65 Mo. App. 55; Mo. Pac. Ry. Co. v. Coombs Commission Co., 71 Mo. App. 299.] Our Statute of Limitations of personal actions, Section 862, Revised Statutes 1929, in cases of fraud and concealment, prevents such actions from being barred by postponing accrual until discovery of the fraud. Other situations have arisen where this court has held a party estopped by this conduct to set up limitations as a defense.

In Sonnenfeld v. Rosenthal-Sloan Millinery Co., 241 Mo. 309, 145 S. W. 430, an officer of a corporation, in wrongful possession of a note, refused to allow the owner to see it and led her to believe that he and not the corporation had signed it. The owner commenced suit against the officer personally and he produced the note, after the Statute of Limitations had run. It was executed by the corporation only. It was held that the corporation, in the subsequent suit against it, was estopped to set up the Statute of Limitations as a defense.

In McFarland v. McFarland, 211 S. W. 23, a widow was put in possession of land and given profits therefrom, under an oral agreement between herself and her children, in recognition of her dower right. After eleven years they repudiated the oral contract and disseized her. This court held they were estopped from pleading the Statute of Limitations to her action for assignment of dower. Although both of these cases were ruled upon the doctrine of estoppel, it seems that the acts held to create the estoppel might well have been construed to be an "improper act" preventing the commencement of the action, within the statutory period, referred to in Section 879, Revised Statutes 1929. The same may be said of cases like McMurray v. McMurray, 180 Mo. 526, 79 S. W. 701, and Prewitt v. Prewitt, 188 Mo. 675, 87 S. W. 1000, which were suits to establish resulting trusts and which held that a plaintiff had ten years in which

to bring suit, after discovery of the fraudulent use of his money by defendant to purchase land and take title in his own name.

However, under the finding of the Chancellor, here, that there was no agreement to await the outcome of the Booth case, and under the evidence showing knowledge of facts, by Dr. Annie Scott, sufficient, at least, to put her upon inquiry as to her rights, we cannot say that defendant was estopped to plead the Statute of Limitations to this action to recover real estate. Plaintiffs, in their brief, contend that even though not entitled to recover the land, they should have a vendor's lien on it or a judgment for the par value of the stock. Neither of those actions was this action, which they brought, and, if either of them had been, it would likewise be barred by the Statute of Limitations.

The judgment is affirmed. *Ferguson,* and *Sturgis, CC.,* concur.

PER CURIAM:—The foregoing opinion by HYDE, C., is adopted as the opinion of the court. All of the judges concur.

### ON MOTION FOR REHEARING.

HYDE, C.—Appellants ask a rehearing on several grounds, which we have carefully considered, and in light of which, we have again reviewed the whole record.

Appellants' reasons are included in three main contentions:

First: That the deed from the Bargain Realty Company to Dr. S. W. Scott was absolutely void; that no title to the land passed by it; and that, therefore, his position is the same as if he had gone into possession without a deed.

Second: That Dr. S. W. Scott was not in possession under color of title; that his right to the land could not be established by constructive possession following the deed but only by continuous, actual, adverse possession; and that the evidence does not show that his possession was continuous.

Third: That even though appellants were barred by limitation from recovery of the land, yet, since the stock certificate, which appellants received, was a written obligation to pay a definite sum of money in five years, appellants having brought this action in less than ten years, after the same matured, should be entitled to have this debt (par value of the stock) established as a vendor's lien on the land as the purchase price.

As to the first proposition: A deed procured by fraud will be set aside because fraud vitiates all contracts. [18 C. J. 227, sec. 147; Mentzer v. Mentzer, 30 S. W. (2d) 146; Wilkerson v. Wann, 322 Mo. 842, 16 S. W. (2d) 72; Summers v. Abernathy, 234 Mo. 156, 136 S. W. 289; Derby v. Donahoe, 208 Mo. 684, 106 S. W. 632; Turner v. Turner, 44 Mo. 535.] A deed procured by fraud is ordinarily held voidable and the same is true of a deed procured by undue influence

or duress. [18 C. J. 242, sec. 175.] Such a deed may be ratified. [18 C. J. 243, sec. 178; Wood v. Kansas City Home Tel. Co., 223 Mo. 537, 123 S. W. 6; Bray v. Haskins (Mo.), 229 S. W. 1074.] Undoubtedly, appellants could have ratified their deed had it been for any reason, to their advantage to do so. One who has been injured by fraud always has the right to accept the situation created by the fraud and seek to recover damages; or he may repudiate the transaction and recover the specific thing lost. [27 C. J. 18, 128; State ex rel. Cary v. Trimble (Mo.), 43 S. W. (2d) 1050.] Indeed, that is the right appellants, in effect, claim by the third contention above referred to. A deed which can be ratified, by the person who made it, ordinarily, is only voidable. Examples of deeds absolutely void are: Deeds made by one permanently incapacitated mentally (Hall v. Almond (Ga.), 137 S. E. 825; Vining v. Ramage (Mo.), 3 S. W. (2d) 721); forged deeds (18 C. J. 224, sec. 138; Neal v. Pickett (Tex.), 280 S. W. 748); deeds to which signature is fraudulently procured when grantor had no intention of signing a deed (Horvath v. Natl. Mortgage Co. (Mich.), 213 N. W. 202, holding this amounts to forgery). See, also, notes 14 A. L. R. 316, 56 A. L. R. 582; and deeds which have otherwise been procured by fraud without a valid delivery. [Pitts v. Sheriff, 108 Mo. 110, 18 S. W. 1071; Meador v. Ward (Mo.), 260 S. W. 107; Delaney v. Light (Mo.), 263 S. W. 813.]

However, we think that appellants must, in any event, fail on their second proposition. It may be noted here that the statute, Section 850, Revised Statutes 1929, bars recovery after ten years *from the time when appellants were seized or possessed of the premises.* Appellants admit that they went out of possession when they conveyed the land to Dr. S. W. Scott. He immediately put men to work on it and thereafter rented it to Davidsons, the dairy people, who went into possession under him and used the entire tract for pasturing their cows. Appellants seek to avoid their failure to be in possession after that time or to disaffirm their transaction, within ten years, by the contention that there were times when Dr. S. W. Scott was not in actual possession of the land, and that at such times the appellants, being the true owners, must be considered to have been in constructive possession. This contention is based upon the contention that the deed to Dr. S. W. Scott was absolutely void; and that therefore constructive possession followed the title back to appellants (evidently without appellants knowledge, since they claimed no possession and paid no attention to the land during those years) whenever his actual possession ceased.

The cases of failure to show adverse possession cited by appellants, to-wit, Stone v. Perkins, 217 Mo. 602, 117 S. W. 720; Hays v. Pumphrey, 226 Mo. 119; Kingsolving v. Laswell Lbr. Co., 300 S. W. 506; Jamison v. Wells, 7 S. W. (2d) 347, are all cases where the acts of ownership were very slight. However, in the latter case, where

plaintiff claimed under a *void* tax deed, on first appeal (250 S. W. 63), this court held much weaker evidence of adverse possession than that in this case was sufficient for the jury to make a finding of ten years continuous adverse possession. We also find in that opinion the following statement (7 S. W. (2d) l. c. 348):

"No more affirmative act of ownership can be asserted than the rental of the land by the plaintiff and the collection of the rents thereon. The inclosure of the same by fences at different times and the payment of taxes due on the land are, in addition to other more potential facts, persuasive evidence of actual possession. [Phillips v. Boughton, 270 Mo. 365, 193 S. W. 593; Stone v. Perkins, 217 Mo. 586, 117 S. W. 717.]"

While Dr. S. W. Scott said he did not remember which years the land was leased to the Davidsons, but would have to look it up to tell, he did claim that he was in possession either through his tenants or his employees at all times. There was also the evidence of Mrs. Davidson, of Mrs. S. W. Scott, of his foreman and of others who had been on the land. We think the evidence, instead of showing an abandonment of the land by Dr. S. W. Scott, shows that he was exercising extensive acts of ownership over it. It was shown that when the deed was delivered appellants moved off a real estate office which they had built on the land; that Dr. S. W. Scott immediately took possession and had the brush cleared and trees cut; that the Davidsons then rented it for cash rent for two or three years; that then it was rented at higher rental to a cattle man who also used it for pasture; that Dr. S. W. Scott then stopped renting it, and from 1916 to 1918 was improving it, at times employing a large force of men with several teams to quarry rock, fill ravines and grade it, to put it into condition for selling lots; that he had a "No Trespassing" sign on the land; that he built a barn on it, in which to keep the teams used; that his wife looked after it and paid bills for the work when he was away, and that after this work was done, the idea of selling lots was given up, the land was seeded, a new fence was built around it, and he again rented it to the Davidsons for pasture. During the course of this work he claims to have expended more than two thousand dollars. He not only did that, but in 1911 and 1913 he paid off the two mortgages against the land which, with the interest he paid, amounted to almost seven thousand dollars. It hardly seems reasonable that, after doing this, he abandoned it when it was clear of all encumbrances.

Dr. S. W. Scott also paid all the taxes due on the land, which averaged about one hundred dollars per year. He had an attorney examine the title and do what was necessary for "getting the title in shape" so a title company would guarantee it. The evidence was that the land was increasing in value, throughout the entire time, between the delivery of appellants' deed and the commencement of

this suit. There is no evidence that really controverts his claim that he was in possession at all times. Appellants' evidence minimizes the improvements he claims to have made; shows that the building he put on the land was made of cheap material; shows that the old fence was down in many places before the new one was built (which, however, seems to have been when the improvements were being made); but does not show that appellants ever did anything to dispute his possession or to interfere in any way with what he was doing with the land until long after this suit was filed. Even when Dr. Annie Scott did take possession of the land, she did so under a deed which necessarily recognized the title of Dr. S. W. Scott because it was based on an attempt to convey his title under an execution sale. Under this evidence, we cannot say that the finding of the able and experienced chancellor, who heard it, that appellants were not seized or possessed of the premises within ten years before the commencement of this action (either actually or constructively) was unwarranted and should not be deferred to.

Nor can the third proposition of appellants be sustained. The powers of a court of equity are broad but they are limited to the cause of action and issues made by the pleadings. The power to give relief in addition to that prayed for means relief consistent with the suit tried. [21 C. J. 671, sec. 854; 10 R. C. L. 555, sec. 338; Spindle v. Hyde, 247 Mo. 32, 152 S. W. 10, 24; Black v. Early, 208 Mo. 281, 1. c. 313, 106 S. W. 1014; Schneider v. Patton, 175 Mo. 684, 75 S. W. 155; Reed v. Bott, 100 Mo. 62, 12 S. W. 347, 14 S. W. 1089; 21 C. J. 682, sec. 858; Grafeman Dairy Co. v. Northwestern Bank, 315 Mo. 849, 288 S. W. 359; 21 C. J. 688, sec. 861; 10 R. C. L. 556, sec. 338; Reynolds v. Stockton, 140 U. S. 254, 11 Sup. Ct. 773; 35 L. Ed. 474.] To grant the relief asked for would require a decree that appellants' deed was a valid conveyance of the title; that respondents are the owners of the land sued for, but still owe appellants for it, because the par value of the stock certificate was the purchase price; that it was an obligation of Dr. S. W. Scott (and the other incorporators) due in 1913, and was not paid; and that a lien for the amount of this obligation should be impressed on the land as a vendor's lien for the purchase price. Such relief could be granted only in a suit based on an affirmance of appellants' deed to Dr. S. W. Scott. The present suit is based on a disaffirmance of it. It would be based on a sale. This one is based on no sale. Such a suit would be upon the theory that appellants had elected to accept the conveyance as a valid transfer of title for which they received a valuable consideration, namely: the obligation of Dr. S. W. Scott (and the other incorporators) due in five years and enforceable as a partnership obligation. The present suit is upon the theory that appellants had repudiated the transaction and were entitled to recover the land

because they got nothing of value for it. Appellants may have had the right to make a timely choice of remedies and proceed on either theory. It is well settled that they cannot proceed on both.

It is true that the statute, requiring suit to recover land to be brought within ten years after losing possession, is an arbitrary rule. It was within the power of the Legislature to make it eight years or fifteen years. That it was made ten years may work a hardship in this case and that is to be regretted. However, the Legislature did fix the period at ten years and this court has no power to change it.

The motion for rehearing is therefore overruled.