BRANDTJEN & KLUGE, INC., v. BURD & FLETCHER CO., A CORPORATION.
—192 S. W. (2d) 651.

Kansas City Court of Appeals. February 11, 1946.

*James E. Nugent, R. L. Hecker* and *Morrison, Nugent, Berger, Hecker & Buck,* for appellant.

*Granoff & Meyerhardt* and *Maurice Weinberger* for respondent.

DEW, J.—Respondent brought suit in equity August 27, 1942, for balance of purchase price of a printing press sold on conditional contract of sale to appellant, and prayed that the judgment therefor be adjudged a lien on the press, and asked for general relief. Appellant defended on the theory of its rescission of the contract of sale based on alleged breach of contract and warranty, and pleaded a counterclaim for damages for respondent's failure to return to appellant an old press taken in trade, and asked for general relief. Judgment was for respondent on its petition for $1764.37, inclusive of interest, and for a lien on the printing press sold under the contract, with provisions for foreclosure thereof, and for deficiency judgment, and the court further found for respondent on appellant's counterclaim.

The respondent and appellant were, respectively, plaintiff and defendant in the cause, and will be so referred to herein.

On March 12, 1942, plaintiff and defendant entered into a written contract by which plaintiff agreed to sell and defendant agreed to buy a 12x18 New Kluge Automatic Platen Press, with certain equipment listed on the back of said contract; the press was to be equipped with a die-cut envelope feeder instead of the regular feeder; the price of the machine and equipment was to be $2157.30, including sales tax; an old press of defendant's was to be taken in trade at the value of $625 to apply on said price, and the balance, $1532.30, was to be paid to plaintiff in cash in twenty days after the new machine was installed by plaintiff in defendant's plant in Kansas City; plaintiff to furnish a competent man to install the press at plaintiff's expense; defendant to make the necessary electrical connections at defendant's expense, and to furnish help to erect the Kluge press and equipment; the title, ownership and possession of the Kluge press and equipment to remain in plaintiff until the purchase price was paid in full. It was agreed that the ''guarantees printed on the reverse side of the contract are hereby made a part thereof and constitute all the binding warranties'', and that ''no agreements or representations expressed or implied not specified in the warranties on the reverse side hereof respecting this contract or the goods hereby ordered have been made

by first party (seller) unless contained herein, and this contract constitutes the entire agreement of the parties''.

On the reverse side of the contract there appears, among other provisions, the following:

''Kluge Automatic Press Guarantee.

''We guarantee that the Kluge Automatic Press manufactured by us will handle any flat stock from tissue paper to eight-ply cardboard as well as envelopes (made-up or die-cut) with accurate register, provided that stock is not electrified or in otherwise bad condition. . . . 12x18 Kluge Automatic Press—Max. Operating Speed 3000 per hour —Sheet Size Range—Inches 3x4 to 14x18½''.

Under the printed list of equipment it is again noted in handwriting: ''This press is to have the Kluge die-cut envelope feeder in place of the regular feeder''. The following also appears at the bottom of the reverse side of the contract:

## ''BRANDTJEN & KLUGE, INC., WARRANTY

''We warrant the goods of our manufacture for one year, this warranty being limited to the furnishing at our factory of such parts as shall, under normal use and service, appear to us to have been defective in material and workmanship.

''This warranty is limited to the shipment to the purchaser without charge, except for transportation, of the part or parts intended to replace the part or parts claimed to have been defective and which upon their return to us for inspection we shall have determined were defective, and provided the transportation charges for the parts so returned have been prepaid. We make no warranty whatever in respect to hoses, counters, electric equipment or any equipment not of our manufacture.

''The condition of this warranty is such that if the goods to which it applies are altered or repaired outside of our factory, our liability under this warranty shall cease.

''The purchaser understands and agrees that no warranty of the goods of our manufacture is made or authorized to be made by the Company other than herein above set forth''.

On or about April 20, 1942, the Kluge machine was erected in defendant's plant by plaintiff, and the old press delivered to and removed by the plaintiff in due course.

Defendant's amended answer, filed November 29, 1943, denies that the press and equipment were as contracted for and as warranted therein; denies that the same were properly installed by plaintiff, and avers that the erector furnished by plaintiff was incompetent, and that there was great spoilage and little production on the new press, and that the same was unsatisfactory; that defendant had at various times demanded of the plaintiff that it either makes the new press operate properly or return to the defendant the old press and equip-

ment, and to reimburse defendant for loss of production and other damages sustained; that although the new press had at all times been at the disposition of the plaintiff, the plaintiff had failed to return the old press or reimburse defendant for failure so to do, all to the defendant's damages in the sum of $5000; that the said damages consisted of spoilage of material, loss of labor and production, and the plaintiff had not done equity in the premises. The prayer of the answer was that the plaintiff take nothing by the petition, but be required to return and restore to defendant the old press and equipment wrongfully withheld by plaintiff, and to reimburse defendant for the damages sustained by defendant "as a result thereof", declaring the rights of the defendant, and for further relief.

The reply filed September 1, 1944, denied that the contract guaranteed "that said press would handle any flat stock from tissue paper to eight-ply cardboard, as well as envelopes (made-up or die-cut) with accurate register, provided that the stock was not electrified or otherwise in bad condition, and that on sheet sizes ranging from 3x4 to 14x18½ the press had an operating speed up to a maximum of 3000 (impressions) per hour".

The reply further reasserted the "warranty" in the contract as to parts, hereinabove quoted, and stated that no such parts has been returned to plaintiff by defendant, and stated further that defendant had exercised control over and had use said Kluge press for defendant's own purposes since April 22, 1942, to date.

The trial of the cause was on September 25, 1944. In the judgment rendered the court found the issues on plaintiff's petition in favor of plaintiff and against defendant, and found the issues on defendant's counterclaim in favor of plaintiff and against defendant. It further found that there was due and owing to the plaintiff from the defendant on plaintiff's petition the sum of $1532.30, together with interest thereon from June 1, 1942, in the sum of $232.07, or the total sum of $1764.37; that plaintiff was entitled to a lien for the last mentioned sum upon said Kluge press, and entitled to have the said lien foreclosed. It was further decreed that the plaintiff have judgment against defendant on said petition for the sum of $1764.37, together with costs, to be levied first out of said Kluge press, and if said property be insufficient to satisfy said debt and costs, the remainder to be levied out of other property of the defendant, and for execution. The court further adjudged that defendant take nothing by its counterclaim.

Defendant's sole assignment of error is that under the pleadings and the evidence, judgment should have been for the defendant and against the plaintiff on plaintiff's petition. It makes thereunder the points (1) that this court must consider the evidence and determine the issues *de novo*; (2) that the plaintiff was not entitled to recover because it failed to perform the terms and conditions of the contract

on its part to be performed; (3) plaintiff was guilty of breach of warranty and defendant was entitled to and did rescind, and (4) defendant did not waive its right to rescind. In its brief defendant stated its contentions under the above points as follows:

"First, that plaintiff is not entitled to recover in any event because the contract on which it bases its right to recover was never performed by it that it never shipped all of the quipment purchased and never furnished a competent man to install the press and the equipment as it had contracted to do.

"Second, that if the press and equipment contracted for were shipped and properly installed, it was not as warranted, and defendant having duly rescinded the contract, plaintiff should be required to accept defendant's tender of the new press and return to defendant the old press which was traded in on the new press".

Plaintiff, in effect, contends that the defendant had no grounds for rescission, and if it did, that right was waived by continued use of the press after tender of return.

It cannot be determined by the judgment and decree of the chancellor whether the court was of the opinion that there had not been a breach of the contract, warranty and guaranty by the plaintiff, or whether the court determined that there had been such a breach, but that the defendant, by its long usage of the machine, had waived its right, if any, to claim rescission.

Plaintiff's evidence tended to prove that following the contract of sale and delivery of the press to defendant's plant at Kansas City, plaintiff sent its machinist to install the machine and equipment; that he was experienced in installing plaintiff's machines, and that he installed the press in defendant's plant on April 20, 1942. It had a die-cut envelope feeder attached. He spent several hours in installing the machine and got it ready for electrical attachments which were thereupon attached by the defendant; that the erector then ran the machine to make sure that the parts were moving freely. He then had the defendant's pressman put a job on the machine which, witness believed, was a flat stock job. The machine ran perfectly. They then put on another job, which was satisfactory.

On that day or the next, there was, however, one job put on the machine while the erector was present, that could not be run. That was a carton job which was too wide to go through the side guides of the machine. The carton as cut was of the size and shape of Exhibit 18, offered in evidence. This exhibit is a cardboard about 1/16 of an inch in thickness, and its over-all dimensions are $18\frac{1}{8}$ x $10\frac{1}{4}$ inches. The main body is creased so that, when folded, it would form the top of the carton, and is $3\frac{5}{8}$ inches wide by $11\frac{3}{8}$ inches long, and two sides of the same length, 3 5/16 inches wide, with other creases and attached flaps so designed that, when folded, the whole makes a cheese carton open on the bottom side. Printing appears

on the top and each of the two sides, and on each of the two flaps which form the closed ends of the completed carton. Lying flat the cardboard is not a true rectangle because of the protrusion of the end flaps beyond the main body of the cardboard, and because of certain diagonal cuts off the inside corners of the end flaps of the two sides necessary for proper fittings when the carton is creased, folded, and ready for use. It will be noted that the over-all dimensions of Exhibit 18 are within the maximum dimensions for flat stock provided in the guaranty heretofore quoted. It was explained that when this sort of stock was placed in the Kluge machine in question, the guides of the machine have to be against the lower sides; the carton would stay up and would not pass the guide, and the machine and equipment could not have been so installed or erected as to handle this particular carton. Plaintiff's witness said that this kind of carton stock is not "flat stock" but that it was, however, die-cut stock. Plaintiff's erector had never before installed a Kluge machine with a special die-cut envelope feeder, such as was on this machine. Although the guide on the machine was adjustable up and down, it could not be adjusted for the width of a carton such as Exhibit 18; that the suction would lift up the carton, but would not take it down because the carton could not get out of the machine. During the time the erector was present and during the running of the other jobs the machine made an approximate speed of 2000 impressions per hour; that upon the completion of the installation plaintiff's erector asked defendant for an approval, which was not given because defendant was not satisfied; "they figured that this certain carton should be run on it". Thereafter the erector went back to the plaintiff's plant in St. Paul to get advice as to the running of this machine. Several days thereafter he returned to defendant's plant, and the machine was in operation, making from 2500 to 3000 impressions per hour, but he did not notice what kind of a job defendant was running at the time; that the jobs run on the first day were letterheads and light cartons (not die-cut) and, also, a butter carton. The machine was not designed to run the butter carton, but defendant did run such cartons on the machine. The feeder on this machine is not used for handling die-cut stock. Plaintiff had discontinued making the die-cut magazine type. The feeder on the press in question could be used for "flat stock" and die-cut envelopes only; that although envelopes are not square, they have no creases and are "flat stock". Witness admitted that defendant's pressman seemed to be competent.

Defendant's evidence tended to show that before the purchase, the defendant had as a part of its plant equipment a press with a Kluge feeder attached, the one traded in on the new press, and that with the old machine they had been handling carton work almost entirely.

According to defendant's evidence the new machine has not been able to attain 3000 impressions per hour; that there is a large number

of papers that it will not run, and which could be run on defendant's old machine; that it should run six-ply cardboard at approximately the same speed as eight-ply cardboard. The witness John B. Smith, purchasing agent for the defendant, saw the new press in operation two or three weeks before trial. A shipping order from the plaintiff was introduced, covering the machine and equipment in question and, among other things contained, it showed stock numbers of two back orders as being short in the shipment.

Defendant introduced a letter from plaintiff dated March 17, 1942, acknowledging the order and assuring the defendant of plaintiff's cooperation in making the investment a profitable one. It further introduced a letter from plaintiff to defendant dated May 14, 1942, referring to defendant's letter returning plaintiff's statement of account, and advising the defendant that if the defendant had any part or parts of the machine which were defective, the parts should be returned to plaintiff for inspection as provided by the guaranty, and that plaintiff was willing to live up to its guaranty, which was, it stated, also binding on the defendant. Defendant introduced a letter from the plaintiff addressed to the defendant and dated July 19, 1942, wherein the plaintiff states that their erector had reported the machine running absolutely perfectly, and that the only difficulty was that defendant desired to run one particular carton job on it which could not be run on that type machine, and plaintiff stated that defendant knew it was getting a press of the same type as the old one, and must have known that it would require special attachments to run that certain job on the new press; that if they had contrived by ingenuity to run such a job on the old press, defendant could operate the new machine to run the same job. Plaintiff pointed out in the letter that it did not sell the new press to print that particular kind of job; that defendant was trying to take a sheet 18¼ inches wide through a hole that was only 14 7/16 inches wide. Plaintiff stated that it understood defendant had hanging on its wall a special attachment used on the old press, and that if it wished to run this particular carton job, defendant could use that attachment on the new press. the letter stated also that the carton in question is not a regular sheet of paper. As to the quantity, plaintiff wrote that defendant was getting better production than the reported 1900 impressions per hour; that the press was operating satisfactorily, and gave excellent production except on the one particular carton job; that defendant was not specific in naming any other jobs which could not be run on the machine. Plaintiff advised that unless payment be forthcoming without delay, the account would be turned over to attorneys. Thereafter defendant received from local attorneys demand for payment.

Further evidence of defendant by the testimony of its plant pressman tended to show that while the erector was installing the machine, he admitted that he had had little experience with the style of feeder

attached; that there were some special guides delivered with the machine which defendant still had on hand, but were never installed and have never been used, and they were designed to handle the particular cartons described; that their use had never been explained to the defendant, and defendant had never been able to determine how they could be used; that the machine is operating, but not satisfactorily because of the lack of production which has averaged around 2000 impressions per hour; that the machine has been in daily use since it was installed. It was explained that cardboard is hard to separate on an automatic press feeder because it runs in different weights, and without grippers to separate it. The grippers used on defendant's old machine could not be installed on the new machine without installing a new gear, and the operation of the feeder on the new machine is different in the movement of the feed arm. There was likewise difficulty in a heavy ink job in the operation of the grippers. Trouble was also had with the elevator on the machine for the first month; also trouble had been experienced with the motor of the press, which burned out and twice had to be rewound.

Defendant's pressman further testified that there are two types of cartons that could be run on the old machine that cannot be run on the new machine. Plaintiff's erector was asked how the attachments might be made to the guides of the new machine to handle cartons, but he stated to witness that he did not know anything about it, and had had no instructions regarding it. On the machine bought, the butter box has been run at certain times, and at other times it is necessary to print over where the guide comes, and it is necessary to have a different kind of guide to run it. Any kind of cardboard is hard to operate on any machine whether it is cut regular or cut square, and if cut irregular, and the flap on the front of the cardboard becomes entangled with the flap on the cardboard beneath, they sometimes hang together. On the old machine there was a gripper that separated the cartons. This gripper was not put on the new machine because the gear would have to be changed. It was put on the old machine without changing the gear because on the old one the feed arm would rise, but on the new one, it would not. There were two jobs that would not run on the new machine—one a cheese box and another, a medicine box. Both could have been handled on the old press. There should have been no difference in feeding such cartons whether the feeder was an automatic die-cut envelope feeder on a regular feeder. Witness explained that the old machine was equipped with a die-cut envelope feeder, and a special attachment applied to it, but only to separate the sheets and not to feed them. He said that the new press ran around 2800 impressions per hour the first time and has since run about that speed.

Witness admitted that top speed is not attainable in a machine on every type of work. He knew of no part of the press that had been

returned to the plaintiff. While the average speed of the new press was 2800, the highest number of impressions obtained was 2500. The rate of 3000 had never been obtained on the new machine. Defendant introduced the following telegram sent by it to the plaintiff dated April 27, 1942:

"Having great spoilage and little production on Kluge Press installed April twenty-first Erector left without our approval of installation Holding up important work. Send competent erector at once ADVISE".

To this the plaintiff wired: "What is your trouble Is there defective part". The next telegram dated April 29, 1942, from defendant to plaintiff read: "Press not satisfactory We cannot afford to keep Please give disposition by Wire". Plaintiff replied by wire: "Contract very specific. Any part or parts defective return to factory in accordance with guarantee". On May 1, 1942, defendant wrote the plaintiff a letter, referring to the defendant's wire of April 29, 1942, again reviewing the claimed nonperformance of the press, and said, in part:

". . . Another two weeks elapsed and we heard nothing more from him (Plaintiff's erector). In the meantime the press was not doing the job and we had to pull practically every form that we put on it.

"This morning your erector showed up again, and the writer had some discussion with him about the entire matter and we are satisfied that he knows very little about this machine, and we are also satisfied that unless some adjustments can be made on it, it would not be suitable for our work at all.

"Therefore as the machine has not lived up to any of the guarantees or promises made by you, we do not feel that we care to experiment with it any further as we have lost too much production already, and we would thank you to return our press and take this one out".

On May 8, 1942, defendant returned to plaintiff the statement of account covering the new press and equipment and stated:

"We wrote you rejecting the press on account of its not being able to perform as guaranteed, and wish you would kindly cancel these charges and return our press to us".

Again on May 12, 1942, plaintiff wrote defendant, acknowledging defendant's letter of May 1st, stating plaintiff's willingness to abide by the terms of the guaranty as per its telegram, and suggesting that defendant return to plaintiff any part or parts claimed defective or plaintiff's inspection as per the guaranty. Plaintiff stated therein that the defendant had received a standard machine capable of producing work as provided in the guaranty with a capable operator, and stated: "This is your machine and any automatic equipment is limited to the ability of the operator and the material used".

On June 5, 1942, defendant received from the legal department of plaintiff a letter, stating that plaintiff had been informed by its erector that the machine in question was operating properly and at the rate of 3000 per hour; that it had been run too fast at first for a new machine of which defendant had been warned by plaintiff's representative, and stated that the operating speed cannot be attained on every job, and that no specific speed is guaranteed on any job. In regard to the one carton job which had been reported unsatisfactory, the writer stated defendant had run such jobs on its old machine because of extra attachments; that if defendant wished to alter the new press to handle the particular job it is "up to you". The letter pointed out that it was the duty of the defendant to ascertain whether any part or parts were defective because the contract so provided. Defendant was notifid in the letter that plaintiff would continue to hold it to the contract.

On May 23, 1942, defendant wrote to the plaintiff, stating that plaintiff was bound on its contract not only to furnish a press which would handle certain material, but to furnish at its expense a competent man to install the press; that defendant had notified plaintiff that the press did not operate satisfactorily, and notice had also been given to plaintiff's erector to that effect, and the erector had agreed that it did not operate satisfactorily. Defendant denied it was its duty to ascertain if any of the parts were defective; that it was a new press and it was plaintiff's duty to see that the equipment was properly installed and operated satisfactorily; that defendant needed the equipment to operate as it was supposed to operate, otherwise it would not have ordered it; that defendant had been without the services of the new equipment, and also deprived of the services of the old press, and could not afford to lose the production. The letter further stated that unless the plaintiff took the necessary steps to put the new press in proper and satisfactory operating condition, the defendant would have no alternative but to insist upon the return of the old press and reimbursement for such loss as had been sustained by failure to comply with the contract. The writer denied that the unsatisfactory conditions were attributable to incompetency of the operator. The writer stated that the loss on account of the failure of the equipment was increasing daily, and—"We are deprived of the production for which we depended on this press or the old one that was returned to you. It is therefore imperative that you either put the new press in first class shape immediately or that you return our old press without further delay".

On June 17, 1942, defendant again wrote the plaintiff, reviewing defendant's contentions regarding the installation of the machine, and stating that the defendant had never been able to get over 1900 impressions an hour from the new machine which was sold to defendant on the representation that it would handle all kinds of paper and cardboard, square and die-cut, and that the guaranty printed on the

contract so provided. The letter further stated that it was not defendant's burden to tell the plaintiff what was wrong with the press, but that it was the duty of the plaintiff to install it in satisfactory operating condition; that the new press was so unsatisfacory as compared with the old press that defendant was being seriously damaged in the matter of production of which the old press was capable. The letter concluded:

"We need a press and if you cannot or will not put the new press in good operating condition so that it will do at least as good job as the old press was doing (you represented that it would do better) we must insist that the old press be restored to our use and that you repossess the new press and reimburse us for such loss as we have sustained in the meantime".

On July 16, 1942, defendant again wrote plaintiff, denying that the press was unsatisfactory as to only one particular carton job; asserted that its operation was unsatisfactory on any class of work attempted on it, and that this was known to plaintiff's man who had installed it, and who had asked for and had been refused a letter approving the installation; that if plaintiff could send a competent and unbiased man to operate the press and make it produce what it was supposed to produce, the controversy would be solved. Defendant urged plaintiff to ascertain the true facts by inspection and observation.

Defendant's president was asked what was the difference between flat stock, referred to in the contract, and die-cut stock. He answered that a letterhead was usually 8½ inches wide and 11 inches long, and square on the four corner, and a die-cut job is one made in shape as for a box, or folder into some other design; that an envelope is irregular in shape and die-cut; that anything that is square or rectangular is regarded as a die-cut job; that defendant prints very few envelopes and does not solicit that type of work. He was asked:

"O. After taking the old press out, you continued to use this press?

"A. Yes; we wrote them and asked them to take it out, and return our old press, and when they did not do it, we kept on using the press, until such time as they would see fit to take it out".

He testified that there was probably no more than 15 per cent additional production on the new machine over the old one; that a great deal of the work done on the old press could not be done on the new one. A production report was produced, beginning with April 21st, which the witness said had been kept daily and sent to the witness every morning. The report showed that on April 21, 1942, the production on the new machine was 2156 impressions per hour, and the daily readings thereafter up to the date suit was filed on August 27, 1942, showed the highest reading during that period to be 2750 impressions, and the lowest, 1512 impressions per hour. The witness

testified that the rate of production was necessary in estimating the cost of any given job. He was asked:

"Q. You have been using the machine regularly since this suit was filed, have you not?

"A. I think it has been down quite a bit, when we had repairs to make on it, and the motor has been out of order, or some reason or another.

"Q. Do you know whether the machine is in operation today?

"A. The witness before me can tell you better than I can. I would not know that—I don't get the report on them until tomorrow.

"Q. Do you know whether or not the machine was in operation last Friday? A. I could not say offhand.

"Q. Do you mean the machine was not in service when we went up to look at it? A. Was it in operation when you went up to look at it?

"Q. Was it in operation then? A. I think it was".

The witness stated that he would take for granted that the machine was in operation a few days before the trial when the attorney for plaintiff inspected it. He admitted that it had been kept running most of the time since installation. He estimated that the capacity of the old press was about 1800 impressions per hour, average.

Over plaintiff's objections the court admitted certain correspondence between the parties exchanged during the negotiations prior to the contract of sale, and, also, excerpts from plaintiff's catalogue purporting to pertain to the type of equipment in question. While a court will be more liberal in receiving evidence in proceedings in equity than in suits at law, its consideration of same should be governed by the same rules. "The general rules of evidence in courts of law and courts of equity are the same, and there seems to be no reason under our code of procedure for applying different rules to the admissibility of testimony, considering this an equity case on account of it being a compulsory reference." [St. Charles Savings Bank v. Denker et al., 275 Mo. 607, l. c. 616, 617, 205 S. W. 208. We shall not consider such evidence in this review. 30 C. J. S., p. 874, Sec. 478.]

Plaintiff's erector, being recalled for further examination, testified that on his second trip pertaining to the installation he made no changes in it.

In rebuttal plaintiff's witness Aper Kluge, inventor of the feeder in question, and superintendent and engineer of the plaintiff, testified that there are three types of feeders, one for paper, one for cartons, and one for open envelopes. He said the envelope feeder would perform on flat stock and open envelopes, and some kinds of cartons, but not on all kinds. He knew of no such thing as a carton feeder for all purposes. He said a special carton feeder could be built for any particular job. He said the Kluge envelope feeder, when at-

tached to the Kluge press, would run 3000 impressions per hour, and perhaps more; that the type of paper used in the machine would likewise be a factor; that heavy stock cannot run as fast as lighter stock; that the type of weather might have an effect on the speed, as well as climatic conditions. He said that square or rectangular stock is known as an ordinary flat job, but the machine won't run every kind of irregularly cut stock. He said that Exhibit 18 would not be called flat stock; that while it is flat in some respects, it flaps up in places and the creases distinguish it from flat stock. He stated when the stock is flat, it is not "out of shape", nor contains any creases or flaps. He testified that the erector who installed the machine in defendant's plant was an experienced and competent man in that line. He testified that the two parts that had been delivered but not installed on the machine referred to by defendant's witnesses were not supposed to be used on flat work, nor are they supposed to be used on carton work on the machine in question, but are two small guides that help to feed the open envelopes. He testified that the press as equipped with the die-cut envelope feeder would run die-cut cartons to a certain extent. He said that his company had discontinued manufacture of carton feeders fifteen years ago because they were not a success and would not take in or feed cartons. He said the press was not supposed to attain its maximum speed on any particular job.

Mr. Moulton, plaintiff's erector, further testified that there was a special attachment on defendant's old machine while running the cheese carton; that when that kind of stock would not run on the new machine, the witness offered to put defendant's old attachment on the new machine, but the defendant would not permit him to do so, telling him that they wanted it to run as it was shipped. He told of his conversation with defendant's president on his second call at defendant's plant, and told the president that the new press was being operated close to 2750 impressions per hour, and that it should not be run that fast until it was broken in. The president had replied that the production had to be gotten out and the machine must continue to be run as it was running. Witness had also complained of this matter to the pressman. The president looked at the contract and said the machine was guaranteed to go 3000 impressions, and that he wanted it to continue. Witness admitted that he said to the pressman on the first day of the installation that witness did not know enough about the machine to install it.

By stipulation plaintiff read into the record the average hourly operating speed of the new press from April 21, 1942 to September 25, 1944, broken down as to make-ready time, running time, and average number of impressions per hour of running time while so in use. On six of the days the machine exceeded an average of 3000 impressions per hour, running time; on one day reaching 3900. On the remaining

days it ran under 3000, the lowest being 923. The average of all the daily averages was not computed.

There is substantial evidence of plaintiff's breach of contract and guaranty. The evidence on that question, however, is conflicting, and depends much on the interpretation and application of the trade terms, as for instance, "flat stock", appearing in plaintiff's guaranty. But whether or not we are called upon to determine if there was a breach of the contract and guaranty, or whether defendant had justifiable grounds to rescind the contract, and did rescind it, depends upon a determination first of the point made by respondent that the defendant has waived its rights, if it had any, to rescind, and its right now to stand on its defense of rescission.

The undisputed evidence is that from the date of installation to and including the date of trial, a period of more than two years, the defendant used the press and equipment which it had tendered back. Whatever kinds of jobs defendant ran on the machine in question during that long period, the fact remains that it used the machine to its capacity practically every day and some nights, and was still so using it at the date of trial.

The theory of defendant's defense is that prior to the beginning of the suit on August 27, 1942, it had rescinded the contract, or tendered return of the new press upon a return of the old press, and cancellation of the account.

An essential requirement of a rescission of a sales contract, in the absence of fraud, is to put the parties in *statu quo*. 55 C. J., p. 277, Sec. 257(e). The conduct of the buyer, after offer of rescission and rejection thereof, must be such as is consistent with a repudiation of the contract. He cannot repudiate it and at the same time affirm it. [Branner v. Klaber, 330 Mo. 306, 49 S. W. (2d) 169, l. c. 180, 181.] The effect of further retention of the property after attempted rescission, and the continued use thereof for the benefits of the buyer, is stated in 46 Am. Jur., p. 895, Sec. 765, as follows:

"It is well settled that a purchaser of personal property may waive or lose the right to rescind the contract for breach of warranty or failure of the article purchased to conform to the contract, if he uses it in his business or otherwise as his own property, for his own benefit or convenience, and not merely for testing or preserving it, after he has knowledge of the grounds for rescission. . . . Moreover, after an attempted rescission by the buyer of chattels, which the seller has not accepted, the buyer, if he intends to rely upon it, must adhere thereto and act consistently therewith, and if he thereafter continues to use the property as his own, he may be held to have waived or abondoned the rescission, and may be precluded from rescinding or asserting a claim that he has rescinded; in other words, the use of chattels sold, by the purchaser, after the seller has refused the latter's tender of them in a rescission of the contract defeats the attempted rescission,

if the property was used for the personal benefit of the purchaser, and not merely in compliance with his duty as bailee of the seller. . . .
It is no excuse for the continued use and consumption that it was required by the exigencies of the buyer's business, and it is also immaterial that the buyer, while continuing to use and consume the property, made objections to the quality. . . . ''.

On the same subject it has been stated in Aeolian Company of Missouri v. Boyd, 65 S. W. (2d) 111, l. c. 114:

"An offer to rescind on the part of the purchaser is a repudiation of all his right and title to the property, and he must not thereafter use the property as his own, or exercise any dominion over it other than as a mere bailee for the seller, else his action will constitute a waiver of his right to rely upon a rescission''.

It was further stated by our court in Riverside Fibre & Paper Co. v. Benedict Paper Co., 201 S. W. 584, l. c. 587:

"After a declaration of rescission, a venue cannot treat the property in any other capacity than as a bailment held for the vendor. If he does, he will be held to have waived the rescission. [36 L. R. A. (N. S.) 473, note.]"

See, also Rock Island Implement Co. v. Wally, 268 S. W. 904, l. c. 912; Sturgis et al. v. Whisler, 145 Mo. App. 148, 130 S. W. 111, l. c. 113, 77 A. L. R., p. 1178, et seq.

There are, of course, cases in which slight use of the property retained after rescission has been held not to be such a substantial use as to be inconsistent with that of involuntary bailee, or such use as to be of substantial benefit to the buyer, or in excess of the necessities of preservation, or made in ignorance of defects, or before reasonable time for determining the same, and other conditions not in conflict with the general rule stated. None of these applies to the present case under the evidence presented. It is claimed here that the demand of defendant's business necessitated the use of the property. As seen from the above authorities, this is no justification for such use after tendered rescission and offer to return the property. It is also contended that the continued use diminished defendant's damages. That fact is not sufficient under the evidence here to authorize any use in excess of that of a bailee after tender of return. It is also argued that pending the return to the defendant of its old press demanded of plaintiff, the defendant had a right to keep and use the machine and equipment in question, especially in view of the fact that this is a proceeding in equity instituted by the plaintiff. One of the maxims of equity is that equity follws the law. The fact that this is a suit in equity is not sufficient to change or modify the well established rule hereinabove stated respecting the waiver of a right of a buyer to rescind the sale by his long continued retention and use of the property which he has tendered back to the seller as unsatis-

factory. Nor would the rule be modified by the fact that part of the purchase price had been paid by trading in an old press.

In view of the evidence in this case and the law applicable thereto, we believe that we are not required to determine whether there was a breach of the plaintiff's contract and guaranty, or whether defendant made proper tender of rescission of the contract for the reason that, in our opinion, defendant, by its continued use of the property for its own benefit over a period of more than two years after its alleged offer of rescission and tender of return, has waived its right to rescind and its right to rely on such rescission.

The judgment of the trial court should be affirmed. It is so ordered. All concur.