**UT COMMUNICATIONS CREDIT CORP., Plaintiff,**

**v.**

**RESORT DEVELOPMENT, INC., Defendant,**

**and**

**William and Sharon Winzerling, Defendants/Cross–Claimants/Respondents,**

**and**

**Town & Country Mortgage Co., Defendant/Cross–Claim Defendant/Appellant.**

**No. 62288.**

Missouri Court of Appeals, Eastern District, Division Four.

Aug. 3, 1993.

Motion for Rehearing and/or Transfer to Supreme Court Denied Sept. 8, 1993.

Application to Transfer Denied Oct. 26, 1993.

Julius H. Berg, Julius H. Berg, P.C., St. Louis, Denise Thomas, Suzanne M. Besnia, Riezman & Blitz, Clayton, for defendant/cross-claim defendant/appellant.

Terry Arnold Parkinson, DuBail, Judge, Kilker, O'Leary & Smith, St. Louis, for defendants/cross-claimants/respondents.

CRANE, Judge.

William and Sharon Winzerling brought a cross-claim against Town and Country Mortgage Company (T & C) seeking rescission of their promissory note and deed of trust to T & C securing a $60,000 loan made by T & C to them to finance their purchase of a condominium unit from Resort Development, Inc. They alleged T & C had breached its fiduciary duty as escrow officer and closing agent for the Winzerlings. After a non-jury trial the trial court ordered the Winzerlings' promissory note and deed of trust to T & C rescinded on the ground that there was a mutual mistake of fact regarding the existence of the condominium unit. The trial court declared its judgment to be final and appealable under Rule 74.01. T & C appeals from this judgment. We reverse and enter judgment in favor of T & C on the grounds that the trial court erred in rendering judgment on the unpleaded theory of mutual mistake and there was no evidence to sup-

port a judgment on the pleaded theory of breach of fiduciary duty.

FACTUAL BACKGROUND

*The Parties*

This action arises out of William and Sharon Winzerling's investment in a condominium development at the Lake of the Ozarks, Missouri. The Winzerlings, husband and wife, were residents of St. Louis County. William Winzerling was a corporate executive with a master's degree in business administration. Sharon Winzerling was director of design for an institutional builder.

Resort Development, Inc. was the developer of a condominium complex at the Lake of the Ozarks, initially known as Osage House and Osage Village Condominiums, but later known as Breckenridge on the Lake ("BOTL" in the trial court's findings). It had an office in St. Louis County. Resort Development is a defendant in the underlying suit, but is not a party to the cross-claim.

T & C is a Missouri corporation engaged in the mortgage banking business in St. Louis County. In 1983 T & C made a commitment to Resort Development to provide conventional first mortgage loans under specified conditions to purchasers of the condominium units. T & C provided permanent mortgage financing on approximately 60 of the development's 306 units, including the unit purchased by the Winzerlings.

*Chronology*

In the fall of 1983, the Winzerlings sought investment and tax preparation advice from their accountant who suggested an investment in Resort Development. After telephone and written communications with a representative of Resort Development, the Winzerlings met with two representatives of Resort Development to review data and select a condominium unit at Resort Development's Osage Village for purchase. They were shown plats and maps of the project. They were also given sample IRS forms filled in to show how federal income tax benefits could be calculated on a condominium unit purchased for $75,000 on December 1, 1983. The Winzerlings decided to purchase Unit 249 in Osage House I for $75,000.

While at the meeting at Resort Development, the Winzerlings signed a Contract for Deed, an Income Participation and Management agreement, an agreement granting Resort Development management rights for Unit 249, and an agreement giving Resort Development permission to contract with a hotel/motel management company. William Winzerling also signed a Purchase Agreement.[1] The three management agreements referenced Unit 249. Neither the Contract for Deed nor the Purchase Agreement contained a unit designation or a description of the property to be conveyed. The Purchase Agreement provided that the seller had the option of substituting a comparable and equivalent unit. The Winzerlings also signed some documents in blank which they understood were to be used for future financing. Each of the Winzerlings testified that they signed all the documents that were handed to them, but did not read them. All documents were signed on the evening of December 2, 1983, even though they bore different dates.

Pursuant to the Contract for Deed, the Winzerlings signed "Note A" for $60,000 and "Note B" for $15,000, both payable to Resort Development for the purchase of the unit. "Note A" was for twelve months or until the unit was sold or commercial financing was obtained, whichever event occurred first. "Note B" was for five years.

The Winzerlings purchased the condominium unit as an investment, not as a vacation home. The documents of purchase illustrate the nature of this investment. The agreements gave the developer the right to manage the unit as part of a hotel operation. The Income Participation and Management Agreement provided the Winzerlings would make their unit available for lease and occupancy in the normal operation of the hotel under the supervision of the management company which would handle all rental and provide maintenance and hotel services. Rental income from all units in the condominium development was to be aggregated and allocated to the individual owners on a

1. Sharon Winzerling disputed her signature to this document.

percentage of ownership basis. The Winzerlings could use the unit they purchased if it was available, but they would have to pay the prevailing rental rate. All payments made by Resort Development to the Winzerlings represented a percentage of income from the whole condominium project.

Beginning in February, 1984, the Winzerlings received statements from Resort Development of principal and interest payments due on Notes A and B. They made monthly payments on the two promissory notes for the month of January, 1984 and subsequent months. The Resort Development statements initially designated Unit 249 as the Winzerlings' unit. However, on the June 4, 1985 statement from Resort Development, the number 249 was scratched out and in its place was written Unit E–1. William Winzerling asked someone at Resort Development about the change and was told that the change reflected a renumbering of the units.

The Contract for Deed provided that Resort Development would convey title to the condominium unit to the Winzerlings by general warranty deed when the outstanding notes were paid in full. A general warranty deed conveying Unit E–1 of Osage House Condominium I, Amended, to the Winzerlings dated June 5, 1984 was recorded by the Camden County Recorder of Deeds on June 8, 1984.

On or about June 5, 1984 Chippewa Bank made a bridge loan to the Winzerlings for Unit E–1 in the amount of $60,000. William Winzerling testified that he understood that he and his wife were to receive a bridge loan from Chippewa Bank and he "thought" he had a bridge loan from Chippewa Bank. Chippewa Bank's loan file contained a copy of a letter dated June 4, 1984 from Chippewa Bank to the Winzerlings offering a bridge loan of $60,000 for four months at 14% on Unit E–1, Osage Condominium I, Amended. Interest was to be paid at maturity. Chippewa Bank's copy of the letter bore the Winzerlings' signatures, accepting its terms, dated June 5, 1984.[2] This loan matured on October 4, 1984 but was apparently extended. A Chippewa Bank document showed a balance due on the loan of $60,000 principal and $4,498.36 interest as of December 18, 1984. Daily interest was $22.95.

Charles E. McElyea, an attorney, testified that his firm did the title work and served as escrow agent on the $60,000 loan by Chippewa Bank to the Winzerlings for Unit E–1. His office received the bridge loan documentation for Unit E–1 from Chippewa Bank. This included a loan closing statement dated June 5, 1984 and the deed of trust. Mr. McElyea testified his office conducted a title search on Unit E–1, recorded the warranty deed to Unit E–1 from Resort Development to the Winzerlings, and recorded a deed of trust on Unit E–1 from the Winzerlings to Chippewa Bank. On June 8, 1984 his office also issued an owner's title insurance policy on Unit E–1 to the Winzerlings in the amount of $75,000 and a mortgagee's title insurance policy to Chippewa Bank in the amount of $60,000.

■ The deed of trust from the Winzerlings to Chippewa Bank, into which a promissory note from the Winzerlings to Chippewa Bank was integrated, was recorded by the Camden County Recorder of Deeds on June 8, 1984.[3] After recording the deeds, McElyea's office, in accord with instructions from Resort Development, sent the original warranty deed to Resort Development. His office sent the original deed of trust to Chippewa Bank.

■ The Winzerlings made a six month interest payment on this loan in December, 1984 by check payable to Resort Develop-

2. William Winzerling testified that the signature on the letter "appeared" to be his, but he did not recall receiving it or remember signing it.

3. The Camden County Recorder of Deeds and Clerk of the Circuit Court certified that this document was a true and correct copy of the original. This exhibit was offered into evidence without objection. Both Winzerlings' signatures appeared thereon. The signatures were notarized by an employee of Resort Development. William Winzerling testified that the signature on the promissory note "appears" to be his signature, but he did not "recall one way or the other" that he signed it. Sharon Winzerling did not testify about this note. The trial court's finding that there was no signed promissory note to Chippewa Bank from the Winzerlings is not supported by substantial evidence.

ment in the amount of $4,198.40. This check was marked "interest" and was for payment of the interest owed to Chippewa Bank. Chippewa Bank's files contained a copy of a letter addressed to the Winzerlings dated December 31, 1984 informing them, for use in tax return preparation, that they had paid Chippewa Bank $4,544.25 in interest on Unit E–1 in 1984.[4]

By letter dated September 28, 1984, Resort Development forwarded to the Winzerlings a photocopy of the general warranty deed dated June 5, 1984, conveying to them Unit E–1 of Osage House Condominium I, Amended. William Winzerling testified he looked at the copy of the deed and was satisfied with it.

In the fall of 1984, the Winzerlings obtained long-term financing from T & C to pay off the bridge loan from Chippewa Bank. An employee of Resort Development obtained the credit information and completed the documents for the Winzerlings' loan application and submitted them to T & C. On August 3, 1984 the Resort Development employee sent the Winzerling "credit package" to T & C for its approval. T & C required that a loan application be prepared by someone, not necessarily the borrower. T & C verified the credit and employment information and obtained an appraisal, a credit report and a title insurance binder. On September 19, 1984 T & C sent the Winzerlings a Mortgage Loan Disclosure statement for Unit E–1 to sign and return and a Good Faith Estimate for their records.

The date on the closing documents for the T & C loan was November 30, 1984. T & C prepared the loan closing and settlement documents. T & C obtained the dollar amounts from McElyea's firm which was acting as escrow agent and agent for the title insurance company and was doing the title work. T & C obtained the legal description for Unit E–1 from the title binder. As a normal practice with respect to the closings on the condominium units of this development, for the convenience of the borrowers, T & C sent the completed loan package to Resort Development to obtain the borrowers' signatures.

The Winzerlings signed a Deed of Trust and a condominium rider for Unit E–1 dated November 30, 1984 in favor of Town & Country Mortgage Company and a Promissory Note dated November 30, 1984 for $60,000 to Town & Country.[5] They signed a Loan Closing Statement for Unit E–1 showing the amount of the loan and how it was to be disbursed. They further signed a settlement statement for Unit E–1.

The Winzerlings' signatures were notarized by a Resort Development employee. A T & C representative was not present when the Winzerlings signed their loan documents. As a normal practice with respect to the closings on these units, Resort Development would return the signed documents to T & C which would then forward the documents to the title company for recording and disbursement of the loan proceeds. Because the loan proceeds were to be used to pay off the Chippewa Bank bridge loan, the borrower was not given a check in the amount of the loan. Rather the proceeds were given to the escrow agent for disbursement.

4. The trial court found that the Winzerlings never made any payments to Chippewa Bank. This finding is not supported by substantial evidence. By the terms of the bridge loan, no payments of interest or principal were due until the loan matured. William Winzerling admitted his check payable to Resort Development was to pay six months interest owed to Chippewa Bank and, although he testified he did not recall receiving the Chippewa Bank letter stating the amount of interest the Winzerlings had paid, he did not doubt it was genuine. The Winzerlings reported $9,507 in interest expenses on Schedule E of their 1984 federal income tax return relating to their interest in the condominium, an amount sufficient to cover the interest paid to Chippewa Bank as well as on Notes A and B. Further, the principal on the Chippewa Bank bridge loan was paid with the proceeds of the T & C loan to the Winzerlings.

5. During trial Sharon Winzerling initially denied that she signed the promissory note or deed of trust to T & C and testified she was out of town on November 30, 1984, but on cross-examination, when she was shown the originals of the documents, she admitted her signature was on the documents. On redirect she further testified that she was not disputing her signature on the original Promissory Note and Deed of Trust. The trial court's findings that she had not signed those documents is not supported by the evidence.

As escrow agent, McElyea testified his firm was obligated to see that T & C received a good first deed of trust on Unit E–1, Osage House Condominium I, Amended. In this connection it disbursed the $60,000 loan proceeds to Chippewa Bank to obtain a deed of release on the note and deed of trust held by Chippewa Bank. The loan closing statement for Unit E–1 signed by the Winzerlings showed this disbursement was made with their approval. Chippewa Bank acknowledged receipt on December 19, 1984 of the loan payoff from the McElyea firm.

McElyea's office performed the title search on Unit E–1 for the T & C loan, and wrote both the owner's and mortgagee's title insurance policies as agent for Chicago Title Insurance Company. McElyea's office also recorded the deed of trust to T & C on Unit E–1. McElyea's office then forwarded to Resort Development copies of Chippewa Bank's deed of release and canceled note and the recorded deed of trust to T & C. The title insurance policy on Unit E–1 was transmitted directly to T & C. For providing escrow services on the transaction, Resort Development paid McElyea's firm $200.[6]

The T & C promissory note, deed of trust, and loan closing statement all identified the condominium unit on which the loan was made as Unit E–1. T & C had an appraisal for Unit E–1 in its file. After making the loan to the Winzerlings, T & C sold the loan to an institutional investor, Pawtucket Savings and Trust, but retained servicing responsibility on the loan in accord with its usual practice as a mortgage banker. The Winzerlings made monthly payments to T & C on the promissory note from January 1, 1985 to March 1, 1992, totaling $63,684.

In 1986 the Winzerlings obtained an insurance policy on Unit E–1. The Camden County assessor collected real estate taxes on Unit E–1. From 1983 through 1987 the Winzerlings deducted from their federal income taxes a total of $90,000 in losses consisting of expenses, interest, and depreciation in excess of income from their ownership interest in a "hotel condo" in Osage Beach. For federal income tax purposes, they listed their business as "hotel condo" at Osage Beach, Missouri, and specifically reported that the property was not a vacation or second home and that they had not made personal use of it.

In November, 1987, William Winzerling attended a general business meeting at the development. This was his first visit to the development. During a lunch break he went to the front desk and asked for the key to Unit 249. The desk clerk refused to give him the key to Unit 249 and instead gave him the key to Unit 274. Unit 274 was in the lower level of another building. The unit was heavily soiled and in a condition of disrepair. William Winzerling returned to the front desk and filled out a complaint form. In September, 1988, the development's managers advised the Winzerlings that the contract with the condominium's hotel management company was terminated in November, 1987 and professional hotel operators had been hired.

The Winzerlings continued to receive financial statements and account statements relative to Unit E–1 and the condominium development in 1988. Also in 1988 they filed their 1987 federal income tax return on which they reported their income and expenses from their interest in the condominium.

At some time prior to trial, Resort Development went out of business. However, at the time of trial the hotel was still operating under the management of another organization. No present or past employee or officer of Resort Development testified at trial.

*Lower Court Proceedings*

An action was filed in Camden County by UT Communications Credit Corp. in which Resort Development, the Winzerlings and T & C were defendants, as well as other title

6. The trial court's finding that "T & C permitted Resort Development, Inc., to act on its behalf in taking, processing, and closing this and other BOTL loans," and that "T & C permitted Resort Development, Inc., to conduct the closing of the loan" is not supported by substantial evidence. The evidence shows only that Resort Development submitted the Winzerlings' application to T & C and T & C sent the loan package to Resort Development to obtain the borrowers' signatures. All other steps in the closing process were handled by T & C or the McElyea firm.

holders to the property. On September 26, 1988, the Winzerlings, through their attorney, made a demand on T & C for rescission of the promissory note and deed of trust on Unit E–1. On September 28, 1988, the Winzerlings filed a cross-claim against T & C in the UT Communications action. The cross-claim was severed and moved to St. Louis County for trial. The case was tried on the Winzerling's second amended cross-claim in which they alleged the basis for T & C's liability as follows:

10. Defendant Town & Country Mortgage Company acting as escrow officer and closing agent, for Winzerlings and Resort Development, Inc., wrongfully, negligently, and recklessly disbursed the proceeds of the loan, namely $60,000.00, contrary to the Purchase Agreement, Contract for Deed, representations, and instructions.

11. As a direct and proximate result of said breach of fiduciary duties as escrow officer and closing agent, for Winzerling and Resort Development, Inc., owed by Defendant Town & Country Mortgage Company to Winzerlings, Winzerlings have been damaged.

A non-jury trial was held on the cross-claim on March 25–26, 1992. On May 19, 1992 the trial court issued its Order, Findings of Fact and Conclusions of Law. The court ordered the promissory note and deed of trust from the Winzerlings to T & C rescinded on the ground that there was a mutual mistake of fact regarding the existence of the condominium Unit E–1. The court ordered T & C to return all amounts paid to it by the Winzerlings. This sum included 1) a $3,000 closing fee, 2) a $600 loan fee, and 3) $63,684 as the amount of principal and interest paid to T & C from January, 1985, through March, 1992, on the promissory note. In return, the Winzerlings were required to return the $60,000 loan proceeds to T & C.

DISCUSSION

■ In a court-tried action in equity, the trial court's judgment will be sustained unless there is no substantial evidence to support it, unless it is against the weight of evidence or unless it erroneously declares or applies the law. *Speedie Food Mart v. Taylor,* 809 S.W.2d 126, 129 (Mo.App.1991). T & C raises eight points of error on appeal. Because we find that the case must be reversed on the grounds that mutual mistake was neither pleaded nor proved (point one) and because no fiduciary duty was shown to exist (point three), we consider only those points.

*Mutual Mistake*

1. *Scope of Pleadings*

T & C contends that the trial court erred in rescinding the promissory note on the basis of mutual mistake because the Winzerlings did not allege mutual mistake as a ground for rescission in their second amended counter-claim. T & C argues it did not expressly or implicitly consent to the introduction of evidence of mutual mistake or fraud so as to deem the pleadings amended to conform to the evidence under Rule 55.33(b).

■ Rule 55.33(b) allows pleadings to be amended to conform to the evidence at trial if an issue is tried by the express or implied consent of the parties. *Buchanan v. Mitchell,* 785 S.W.2d 317, 319 (Mo.App.1990). If an objection is made to evidence at trial on the ground that it is not within the issues made by the pleadings, the court may allow the pleadings to be amended. Rule 55.33(b). T & C did not consent to amend the pleadings. During trial T & C specifically, consistently, and repeatedly objected to the admission of any evidence outside the scope of the pleaded claim of breach of fiduciary duty. We quote one of these objections in full to illustrate:

> MR. BERG: I'm going to renew my objection. The pleadings limit the equitable remedy of rescission to a breach of fiduciary duty as an escrow agent.
>
> When this matter was transferred from the law docket, the law calendar, to here I specifically said that I would object to the transfer because if there is going to be any fraud or anything else brought out in this hearing that I wanted a trial by jury.

> Mrs. Terry told Judge Corrigan, no, we're going to limit it to the pleadings and it's going to be a rescission suit.
>
> And the only way that—her pleadings are couched that we breached our duty as an escrow agent. She has to prove that. Any evidence let in that varies from that later on I get caught in the crack of the theory conforming to the evidence.
>
> I renew my objection, Your Honor.

Thus T & C did not impliedly consent to an amendment of the pleadings. *See Buchanan,* 785 S.W.2d at 319; *Green Acres Enters. v. Nitsche,* 636 S.W.2d 149, 155 (Mo.App. 1982).

The record does not reveal that the Winzerlings made a request to amend as allowed by Rule 55.33(b). Further the trial court did not *sua sponte* grant an amendment of the pleadings during trial. In fact, the only time the theory of mutual mistake was even mentioned at trial was in the Winzerlings' argument in opposition to T & C's motion for judgment at the close of the Winzerlings' case.

"'Courts only have power to decide such questions as are presented by the parties in their pleadings.'" *Buchanan,* 785 S.W.2d at 318 (quoting *Carl v. Carl,* 284 S.W.2d 41, 44 (Mo.App.1955)). This rule applies equally to cases in equity. *Branner v. Klaber,* 330 Mo. 306, 49 S.W.2d 169, 180 (1932). However, in its Findings of Fact, Conclusions of Law and Order, the trial court based its decision to rescind the note and deed of trust exclusively upon mutual mistake. The trial court did not have the power to order rescission on the grounds of mutual mistake regarding the existence of Unit E–1. Under the pleadings the court was confined to the sole issue of breach of fiduciary duty. *Housden v. Berns,* 241 Mo.App. 1163, 273 S.W.2d 794, 797 (1954).

2. *Evidence*

Further, there is no substantial evidence in the record to support rescission on the grounds of mutual mistake. Equity may grant relief against a mistake in fact, but it must be a mutual mistake of both parties. *Housden,* 273 S.W.2d at 802. Mutual mistake means that both parties did what neither intended to do. *Heinze v. Hobson,* 622 S.W.2d 17, 18 (Mo.App.1981). Mutual mistake must be established by clear, cogent and convincing evidence. *Id.* To prove mutual mistake the evidence must show that the parties agreed to accomplish a particular object by the deed and that the deed, as executed, was insufficient to effectuate their intention. *Id.*

In ordering the contract rescinded, the trial court found:

> 22. .... There was not a Unit E–1 at the development.... Defendants Winzerling never received the original deed to Unit E–1 nor the title policy. They have been unable to locate a Unit E–1, T & C has never located a Unit E–1, and Charles McElyea of Phillips, McElyea testified that he has never seen a Unit E–1. No one testified that they have ever seen or located a Unit E–1.
>
> 23. Both T & C and the Winzerlings believed that a unit at BOTL was being purchased with the T & C loan proceeds. The Winzerlings believed they were purchasing a Unit 249 that had been renumbered E–1. T & C believed it was giving a loan to purchase a Unit E–1. There is not a Unit E–1 at BOTL and there is not a Unit E–1 that had been previously numbered Unit 249. T & C testified that it would not have provided the loan if there was not real property to secure the loan. T & C also testified, through its president, that it is a mortgage company and that this is the only type of loan it provides. There was a mutual mistake of fact.
>
> 25. .... Both T & C and the Winzerlings mistakenly believed the loan was to purchase a unit at BOTL. The evidence demonstrated that the loan proceeds were not used to purchase a unit. Both T & C and the Winzerlings mistakenly believed that there was a Unit E–1 at BOTL. The evidence demonstrated that there was not a Unit E–1. Furthermore, the Winzerlings believed that they were purchasing Unit 249 and the Income Participation Agreement, which T & C had knowledge of reflected that the unit was to be 249. The Winzerlings have never received a deed to

Unit 249 and have never received a deed to Unit E–1 and therefore do not own it. 26. For the foregoing reasons, there has been a mutual mistake by [sic] fact by Defendant T & C and Defendants Winzerling and, accordingly, rescission is a proper remedy.

These findings are not supported by substantial evidence. With respect to the findings in paragraph 22, there is no evidence that the Winzerlings had been unable to locate E–1. Sharon Winzerling testified she never visited the development. William Winzerling visited only once, but he did not ask anyone to see E–1 or ask if it existed. Instead, he asked for the keys to a numbered unit from a desk clerk. Further, he did not speak to anyone from Resort Development with authority beyond that of the hotel desk clerk about any unit. When asked what steps he took to determine his correct unit, he stated only that he obtained a lawyer.

There was no substantial evidence that E–1 did not exist as found by the court in paragraphs 22, 23 and 25. The finding that T & C and McElyea had not located or seen a Unit E–1 is inconsequential because both testified they had never personally tried to locate or inspect the unit but relied on the written documentation of its existence. The fact that there was no testimony that anyone had seen or located Unit E–1 is likewise inconsequential given the scope of the pleadings and the fact that T & C did not have the burden of proof. There was no affirmative proof that E–1 did not exist. On the other hand there was substantial documentary evidence that a condominium unit with the legal description E–1 existed. Documents introduced at trial showed the unit was conveyed by deed, appraised, taxed, used as security, generated income, and depreciated.

We also find that the remaining findings in paragraphs 23 and 24 are not supported by the evidence and misapply the law. The trial court found that the Winzerlings never received a deed to Unit E–1 and therefore do not own it, citing *Underwood v. Gillespie,* 594 S.W.2d 372 (Mo.App.1980). This finding is not supported by the evidence or by the applicable law. *Underwood* states the rule governing delivery of deeds as follows:

> The delivery of a deed is necessary to pass title, and in order to have delivery there must be acceptance. Whether there was delivery depends upon the facts of each case and all relevant facts and circumstances should be considered in determining the question.

*Id.* at 374 (citations omitted). In *Underwood* the court found title had not passed where the grantor signed a deed and gave it to the grantee, but the grantee told grantor the deed unfairly created certain remainder interests, tore up the deed, and never recorded it. The grantor continued to collect rent and pay taxes on the property. *Underwood* has no factual application to this case.

By the general warranty deed, Resort Development conveyed title to Unit E–1 to the Winzerlings on June 5, 1984. The deed was recorded in Camden County on June 8, 1984. Resort Development mailed a photocopy of the deed to the Winzerlings in September, 1984. In June, 1984 and in November, 1984 the Winzerlings conveyed an interest in Unit E–1 to lenders by deeds of trust. On both occasions their signatures were notarized by an employee of Resort Development.

These circumstances conclusively demonstrate that the general warranty deed was delivered to the Winzerlings and that they own Unit E–1 as described in that deed.

> Whether or not a deed has been delivered is a mixed question of law and fact. The element which controls the resolution of that question is the intention of the parties, especially the intention of the grantor. The vital inquiry is whether the grantor intended a complete transfer—whether the grantor *parted with dominion over the instrument* with the intention of relinquishing *all* dominion over it and of making it presently operative as a conveyance of the title to the land.
>
> It is not necessary, to effectuate delivery, that the deed actually be handed over to the grantee or to another person for the grantee. There may be a delivery notwithstanding the deed remains in the custody of the grantor. If a valid delivery takes place, it is not rendered ineffectual by the act of the grantee in giving the deed

into the custody of the grantor for safekeeping. It is all a question of the intention of the parties, which may be manifested by words or acts or both.

*Meadows v. Brich,* 606 S.W.2d 258, 260 (Mo. App.1980).

In this case the recording of the deed of trust was *prima facie* evidence of delivery. The registry act, § 442.390 RSMo 1986, operates to create a presumption that a recorded deed has been delivered, and, although recording a deed, even by the grantor, does not have the effect of delivery, that fact is *prima facie* proof of delivery. *LeMehaute v. LeMehaute,* 585 S.W.2d 276, 279 (Mo.App.1979); *Wilkie v. Elmore,* 395 S.W.2d 168, 172 (Mo.1965). Delivery was further evidenced by the fact that the grantees twice conveyed the property by a deed of trust with the knowledge and participation of the grantor and the grantor mailed a photocopy of the recorded deed to the grantees. The grantor allocated income and expenses on the property and paid the net income to the grantees. Under these circumstances the failure of the grantor to give the grantee the original deed does not overcome the *prima facie* evidence of delivery.

Further there was substantial evidence of acceptance. "Acceptance, as delivery, may be by word or act without formula or ceremony—according to the circumstances." *LeMehaute,* 585 S.W.2d at 280. Here the grantees used the property deeded to secure loans, they accepted and reported income from the property, they reported depreciation, interest and other expenses on the property, they obtained insurance for the property and paid taxes on it. Further they received a photocopy of the general warranty deed conveying Unit E–1 to them and found it to be satisfactory. Such evidence constitutes acceptance.

The existence of the December, 1983 Income Participation Agreement which references a Unit 249 does not affect the validity of the T & C loan. The T & C loan was made on Unit E–1 and all title documents referenced Unit E–1. Even if Unit E–1 was not the same three-numbered condominium unit the Winzerlings thought it was (on which no substantial evidence was offered) this did not affect the fact that they had title to Unit E–1 and cannot affect the validity of the deed of trust and promissory note they gave to T & C to secure the money they borrowed on Unit E–1.

The evidence conclusively shows that the parties intended that 1) T & C would provide permanent financing to the Winzerlings on Unit E–1, which loan would pay off the Chippewa Bank bridge loan on that unit and cause Chippewa Bank to release its deed of trust to Unit E–1 and cancel the promissory note, and 2) the Winzerlings would give T & C a deed of trust on Unit E–1 and a promissory note to secure that loan. The Winzerlings had legal and record title to Unit E–1, and held that property for months prior to obtaining financing from T & C. They had a bridge loan on Unit E–1 which they had to repay. They held no deed or record title to a Unit 249 and accordingly could not have obtained a loan on that unit or conveyed a deed of trust on that unit. The deed of trust and promissory note as executed secured the loan on Unit E–1 as intended. There was no mutual mistake and the trial court's judgment granting rescission on that basis must be reversed.

*Fiduciary Duty*

In their brief the Winzerlings do not argue that the trial court's judgment should be affirmed on the grounds of mutual mistake, but argue instead that it should be affirmed on the ground of breach of fiduciary duty. The Winzerlings proposed findings of fact and conclusions of law to the trial court on this theory. However, the trial court made no findings on breach of fiduciary duty. We may enter the judgment which should have been made by the court below. Rule 84.14; *Becker v. Southern Baptist Found.,* 485 S.W.2d 696, 698–99 (Mo.App.1972). Accordingly, we next consider if this case should be affirmed under the Winzerlings' pleaded theory that T & C breached its fiduciary duty to them as escrow agent and closing agent by delegating some of its functions to Resort Development and by lending them money on Unit E–1 when the Winzerlings' 1983 Income Participation Agreement with Resort refer-

enced Unit 249. We find that the record conclusively establishes that T & C was not an agent for the Winzerlings and owed no fiduciary duty to them.

The Winzerlings alleged that T & C owed them a fiduciary duty as an escrow agent. It was uncontroverted that the McElyea firm, and not T & C, served as the escrow agent for the transaction. Further, by definition an escrow agent is not a party to the transaction. *See Boatmen's Nat'l. Bank v. Dandy,* 804 S.W.2d 783, 786 (Mo. App.1990). Therefore, T & C could not owe the Winzerlings any duty as an escrow agent.

Further, nothing in the record would support a finding that T & C was a closing agent for the Winzerlings. The activities undertaken by T & C for loan processing were undertaken for its own benefit, not for the benefit of the Winzerlings. It could delegate some of these processing functions at its own discretion. Even if a T & C employee had been present when the Winzerlings signed the loan documents, the employee would have been present on behalf of T & C and not the Winzerlings.

The Winzerlings do not point to any evidence showing that T & C held itself out to the Winzerlings as an agent for the purpose of protecting the Winzerlings' interests at the loan closing. Further the Winzerlings did not look to T & C to protect their interests vis-a-vis Resort Development, which conveyed Unit E-1 to them although *some* of the antecedent documents referenced Unit 249. William Winzerling was specifically asked at trial:

Q. Did you ever ask anyone at Town and Country Mortgage Company to protect you in any way in your transaction with Resort?

A. No.

As a matter of law, absent other evidence of a fiduciary relationship, there is no such relationship between a bank as lender and its customer as borrower. *Brown v. Mercantile Bank,* 820 S.W.2d 327, 334 (Mo. App.1991); *Centerre Bank v. Distributors, Inc.,* 705 S.W.2d 42, 53 (Mo.App.1985). In *Pigg v. Robertson,* 549 S.W.2d 597, 601 (Mo. App.1977), on which the Winzerlings rely, the court found a fiduciary relationship where a customer revealed his intent to purchase a farm to a banker for the purpose of obtaining a loan and the banker used the customer's confidential information to purchase the same farm for himself before the customer could proceed with the loan. However, in this case there is no evidence or claim that T & C used any of the Winzerlings' confidential information for its own advantage. Therefore, the general rule applies.

As lender T & C had no fiduciary duty to the Winzerlings. It could, therefore, not breach any such duty. There is no basis in the record to affirm the judgment on the basis of a breach of fiduciary duty.

## CONCLUSION

The judgment of the trial court is reversed. Judgment is entered in favor of Town & Country Mortgage Company under Rule 84.14.

CARL R. GAERTNER, P.J., and CRAHAN, J., concur.